RENE L. VALLADARES
Federal Public Defender
Nevada Bar No. 11479
TIFFANI D. HURST
Assistant Federal Public Defender
Illinois Bar No. 6278909
MELANIE E. GAVISK
Assistant Federal Public Defender
Colorado Bar No. 41380
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-5819/Fax

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| CHARLES McNELTON, <br><br> Petitioner, <br><br> vs. <br><br> RENEE BAKER, Warden, et al., <br><br> Respondents. | Case No. 2:00-cv-00284-RCJ-CWH <br><br> REPLY IN SUPPORT OF SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS <br> (Death Penalty Habeas Corpus Case) |

Petitioner Charles McNelton submits this reply in support of his Second Amended Petition for a Writ of Habeas Corpus. Mr. McNelton is being held in violation of the laws and Constitution of the United States of America. He asks this Court to grant a writ of habeas corpus and order the State to retry him or set him free.

1

TABLE OF CONTENTS

I.    BACKGROUND ................................................................6

II.   STANDARD OF REVIEW ...............................................6

III.  ARGUMENT ...................................................................8

      A.   Counsel were ineffective for failing to challenge the
           admission of prior bad acts during the penalty phase
           (Claim Five(C)). .....................................................8

           1. Trial counsel's failure to prepare, and reliance on
              the documents the State provided, constituted
              deficient performance. .......................................9

           2. Mr. McNelton was prejudiced by trial counsel's
              failure to prepare for the penalty phase because
              they failed to discover evidence that Mr. McNelton's
              cousin was actually responsible for the 1980 robbery
              and failed to exclude evidence of the arrest ................11

           3. Trial and appellate counsel should have challenged
              the State's use of the non-statutory aggravating
              evidence. .........................................................13

           4. Claim Five(C) is not defaulted. .........................15

      B.   Trial counsel was ineffective for allowing testimony
           regarding Mr. McNelton's custody status and for
           taking the stand and rebutting the testimony of a
           defense witness who testified about Mr. McNelton's
           custody status (Claim Six(D)). ..............................18

           1. Defense counsel took the stand to defend himself,
              undermining Mr. McNelton's alibi defense. ..........19

           2. Trial counsel's decision to put his own interests
              above Mr. McNelton's constituted deficient
              performance. ....................................................20

3.  Trial counsel's deficient performance prejudiced Mr. McNelton by undermining the alibi defense....................21

4.  The Nevada Supreme Court unreasonably rejected this claim by concluding that trial counsel's decision was "tactical." .................................................................22

C.  The trial court violated Mr. McNelton's right to due process by improperly admitting prior bad act evidence during the guilt phase (Claim Eleven(E)). ...........................23

D.  Trial and appellate counsel were ineffective for failing challenge the trial court's refusal to dismiss Mr. McNelton's case based on a violation of the Interstate Agreement on Detainers Act (Claims Six(F) and Fourteen(I)). ..........................................................24

    1.  The IAD mandates that a court "shall" dismiss a case with prejudice for failure to comply with the law...............................................................................25

    2.  The trial court dismissed the case with prejudice based on the prosecutor's representations but vacated its order when the prosecutor retracted his statements. ......................................................................26

    3.  Trial and appellate counsel should have challenged the State's hearsay evidence and the prosecutor's post-hoc repudiation of his statement that he received the required paperwork. ....................................31

    4.  The Nevada Supreme Court's rejection of this claim was contrary to, and consisted of an unreasonable application of, Strickland. ................................................34

E.  The trial court's failure to dismiss his case pursuant to the IAD violated Mr. McNelton's rights to a speedy trial and prejudiced him (Claim Fifteen).............................38

F.  Mr. McNelton's death sentence is invalid because the "under sentence of imprisonment" aggravating circumstance is invalid as applied to Mr. McNelton,

who was not imprisoned at the time of this crime
(Claim Thirteen)..................................................................40

   1. The "under sentence of imprisonment" aggravating
circumstance cannot be constitutionally applied to
cases where the defendant is on parole. .........................40

   2. Even if the "under sentence of imprisonment"
aggravator could apply to defendants on parole, it
cannot be applied to Mr. McNelton, since the State
successfully argued pre-trial that he was *not* under
a sentence of imprisonment. ...........................................44

   3. The jury's consideration of this invalid aggravator
prejudiced Mr. McNelton..................................................45

   4. The Nevada Supreme Court unreasonably rejected
this claim. .......................................................................45

G.  The prosecutor violated Mr. McNelton's right to due
process by improperly commenting on his allocution
and his right to remain silent (Claim Eight(C))...................46

   1. The prosecutor complained that Mr. McNelton's
allocution statement was "not subject to cross-
examination," and that Mr. McNelton was
remorseless. ....................................................................47

   2. The prosecutor's improper comments violated Mr.
McNelton's right to remain silent and his due
process right to a fair sentencing proceeding; the
error was not harmless......................................................48

   3. The Nevada Supreme Court unreasonably rejected
this claim by misapplying <u>Griffin.</u> ...................................50

H.  The trial court erred by allowing the State to comment
on Mr. McNelton's allocution after assuring him that
the statement could not be used against him (Claim
11(B)). ...................................................................................51

   1. The trial court assured Mr. McNelton that his
allocution statement would not be used against him

but then allowed the state to use the statement against him. .......................................................................51

2. The trial court's ruling deprived Mr. McNelton of due process and had a substantial and injurious effect on the sentence. .......................................................53

3. This claim is not defaulted. ..............................................53

I.     Appellate counsel were ineffective for failing to communicate with Mr. McNelton during the direct appeal proceedings (Claim Fourteen(E)). ............................55

J.     The cumulative effect of the constitutional errors in Mr. McNelton's case violated his rights to due process and a fair trial (Claim Nineteen). .........................................57

IV.    CONCLUSION .................................................................................58

V.     CERTIFICATE OF APPEALABILITY ..........................................59

# I.    BACKGROUND

After a jury trial, Charles McNelton was convicted of first degree murder. After a penalty phase, where the defense presented one witness, the jury sentenced Mr. McNelton to death.

Mr. McNelton filed a Second Amended Petition for a Writ of Habeas Corpus on September 27, 2013, asking that this Court release him from his unconstitutional confinement. ECF 133. The State moved to dismiss the petition, ECF 146, and Mr. McNelton opposed the State's motion, ECF 164. This Court largely granted the State's motion to dismiss, but ordered the State to respond to the remaining claims. ECF 175. The State answered the remaining claims, ECF 178, and Mr. McNelton now replies to the State's answer.

# II.    STANDARD OF REVIEW

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 562 U.S. 86, 91 (2011). "Judges must be vigilant and independent in reviewing petitions for the writ." Id.

Mr. McNelton filed his initial federal petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), and therefore his petition is governed by AEDPA. AEDPA does not undermine the importance of the habeas corpus—it harmonizes the new statute with prior law. See Slack v. McDaniel, 529 U.S. 473, 475 (2000) ("AEDPA's present provisions . . . incorporate earlier habeas corpus principles."). Thus, under AEDPA, this Court is not required to simply defer to the Nevada state courts' findings. The Court must review the Nevada state courts' findings to ensure that they have fulfilled their

"responsib[ility] for a faithful application for the principles set out in the controlling opinion of the Court." Ramdass v. Angelone, 530 U.S. 156, 168 (2000).

AEDPA imposes a limitation on relief only for claims "adjudicated on the merits" by the state court. Where a state court did not adjudicate the merits of a claim, because it either misunderstood the claim, failed to reach certain elements of the claim, or inadvertently failed to address the merits of a claim, a federal court employs the traditional, pre-AEDPA standard of de novo plenary review of legal and mixed legal-factual findings. Johnson v. Williams, 133 S. Ct. 1088, 1097, 2013 ("If a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter."), reh'g denied, 133 S. Ct. 1858 (2013); Porter v. McCollum, 558 U.S. 30, 39 (2009) (per curiam) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's Strickland claim de novo."); Cone v. Bell, 556 U.S. 449, 451-52, 472 (2009) (conducting de novo review of petitioner's Brady claim that state court declined to address based on inaccurate view that the claim had been decided on the merits in prior state court proceedings).

Thus, only claims adjudicated on the merits by the state court are subject to AEDPA's limitations on a federal court's power to grant relief. For those claims, a federal court may grant relief where the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable

7

1    determination of the facts in light of the evidence presented
2    in the State court proceeding.

3  28 U.S.C. § 2254(d).

4        Review under section 2254(d)(1) is "limited to the record that was
5  before the state court that adjudicated the claim on the merits." Cullen
6  v. Pinholster, 131 S. Ct. 1388, 1398 (2011). However, once a federal
7  court determines that the state court was unreasonable under
8  2254(d)(1), it reviews the claim de novo. Panetti v. Quarterman, 551
9  U.S. 930, 948 (2007); Wiggins v. Smith, 539 U.S. 510, 528-29 (2003).

10

# III.   ARGUMENT

A.   Counsel were ineffective for failing to challenge the
     admission of prior bad acts during the penalty phase
     (Claim Five(C)).

15       In Claim Five (C), Mr. McNelton argues that trial counsel were
16  ineffective for failing to challenge the admission of evidence of prior bad
17  acts during the penalty phase. See ECF 133 at 70-73.

18       The State presented evidence during the penalty phase that Mr.
19  McNelton robbed someone in January of 1980, and that when he was
20  arrested in December of 1977, he was found with women's watch and a
21  shotgun. Had trial counsel investigated either of these incidents, they
22  would have learned that Mr. McNelton's cousin was responsible for the
23  1980 robbery, and that no charges were filed in connection with the
24  1977 arrest. Thus, adequate investigation would have shown that
25  neither of the prior bad acts were actually "bad." Moreover, trial and
26  appellate counsel should have challenged the use of these non-statutory
27  aggravating circumstances as unconstitutional.

1  While the State now argues that this claim is defaulted, the State
2  waived that argument by failing to timely raise it. This Court ordered
3  the State to respond on the merits to this claim, and that ruling is the
4  law of this case. Alternatively, Mr. McNelton can overcome any default.

5      1.   Trial counsel's failure to prepare, and reliance on the
6           documents the State provided, constituted deficient
7           performance.

8  At the beginning of the penalty phase, the State provided trial
9  counsel with records relating to negative character evidence it intended
10 to present. See 10/11/93 TT at 8-9. Despite receiving the records at the
11 last minute, trial counsel failed to request a continuance to investigate
12 the incidents, and had no time to adequately prepare a defense. Trial
13 counsel's failure to investigate and prepare fell well below prevailing
14 professional norms. See Strickland v. Washington, 466 U.S. 668 (1984).

15 One the most basic and fundamental duties of capital defense
16 counsel is to develop mitigating evidence and challenge the State's case
17 in aggravation. See Wiggins v. Smith, 539 U.S. 510, 524 (2003)
18 (describing "well-defined" norms that require capital counsel to discover
19 mitigation evidence and "to rebut any aggravating evidence that may be
20 introduced by the prosecutor" (citing ABA Guidelines for the
21 Appointment and Performance of Counsel in Death Penalty Cases
22 11.4.1(C), p. 93 (1989))). Thus, "a decision not to present a particular
23 defense or not to offer particular mitigating evidence is unreasonable
24 unless counsel has explored the issue sufficiently to discover the facts
25 that might be relevant to his making an informed decision." Lambright
26 v. Schriro, 490 F.3d 1103, 1116 (9th Cir. 2007). During a capital penalty
27 phase, it is "imperative that all relevant mitigation information be

9

1    unearthed for consideration." <u>Douglas v. Woodford</u>, 316 F.3d 1079, 1088

2    (9th Cir. 2003) (quotation omitted). These standards were well-

3    established at the time of Mr. McNelton's trial. <u>See</u> <u>Hamilton v. Ayers</u>,

4    583 F.3d 1100, 1113 (9th Cir. 2009) ("At the time of Hamilton's capital

5    trial [in the 1980s], his counsel had a duty to conduct "a thorough

6    investigation of the defendant's background.").

7         Mr. McNelton's trial counsel candidly admit that they failed to

8    sufficiently investigate the State's case for death. Mr. McNelton's trial

9    counsel, Phil Kohn,[1] describes the failures of the defense team, and

10   particularly of lead attorney Eugene Martin, in an affidavit. ECF 91-2

11   at 676, Ex. 182 ¶ 7. Mr. Kohn explains that Mr. Martin's "focus was in

12   *arguing* for life over death, not in challenging the State's case in

13   aggravation or developing mitigation." <u>Id.</u> (emphasis added). Mr. Kohn

14   explains that Mr. Martin was "not very diligent in preparing and

15   conducting a penalty phase," and "did not gather many of the necessary

16   records related to Mr. McNelton's background, including records of prior

17   convictions. <u>Id.</u> Similarly, trial counsel Drew Christensen admits that

18   the defense team failed to request "police reports, probation records, or

19   witness statements related to Mr. McNelton's prior convictions," and

20   did no investigation related to the witnesses in Mr. McNelton's prior

21   convictions. ECF 91-2 at 386, Ex. 152 ¶ 4. Rather than conduct an

22   independent investigation, trial counsel "relied solely on the judgment

23   and convictions in preparation for the [defense] case in the penalty

24   phase." ECF 91-2 at 386, Ex. 152 ¶ 5.

25        Trial counsel's admitted failure to investigate and prepare for the

---

[1] Mr. Kohn is now the Clark County Public Defender.

penalty phase fell well below prevailing professional norms. See, e.g., Silva v. Woodford, 279 F.3d 825, 843 (9th Cir. 2002), as amended (Feb. 22, 2002) (holding that counsel's failure to investigate penalty phase evidence "was objectively unreasonable"); Jackson v. Calderon, 211 F.3d 1148, 1162 (9th Cir. 2000) (holding that by "failing to prepare and investigate for a penalty defense, counsel clearly fell below the requisite standard of competence" (citation omitted)).[2] Time and again, courts have emphasized the importance of unearthing all relevant mitigation information. Lambright v. Schriro, 490 F.3d 1103, 1120 (9th Cir. 2007). There can be no serious argument that trial counsel's anemic penalty phase preparation and presentation was consistent with prevailing professional norms. See Williams v. Taylor, 529 U.S. 362, 399 (2000).

> 2. Mr. McNelton was prejudiced by trial counsel's failure to prepare for the penalty phase because they failed to discover evidence that Mr. McNelton's cousin was actually responsible for the 1980 robbery and failed to exclude evidence of the arrest.

Because of trial counsel's woefully deficient performance, the jury heard uncontested evidence that Mr. McNelton committed a prior robbery, and that he was arrested with a woman's purse and a shotgun.

---

[2] Counsel's investigative resources were not simply strategically diverted elsewhere. Trial counsel also failed to conduct family interviews prior to trial, failed to timely obtain school and prison records, and failed to have Mr. McNelton examined by an expert. ECF 91-2 at 676 (Ex. 182 ¶ 7). Trial counsel ultimately only called one mitigation witness, Pastor John Lee. See 10/12/93 TT 31-38. While this Court dismissed Mr. McNelton's claims regarding these failures, ECF 175, they remain relevant in assessing whether counsel's performance fell below prevailing professional norms.

1    The State called Los Angeles Police Officer Thomas Elfmont to

2    testify that he arrested Mr. McNelton for armed robbery after a high-

3    speed chase. See 10/11/93 TT at 123-32, 136-38. Trial counsel did

4    nothing to rebut or mitigate this evidence. Id.

5        Had trial counsel conducted the constitutionally required

6    investigation, they would have learned that Mr. McNelton's cousin,

7    Andre Ransom, was actually responsible for the robbery and would

8    have admitted as much to the jury:

9        The truth is that Chuck never planned to rob anyone, the
10       guns that were used belonged to me and Chuck had no idea
11       of what I was planning to do.

12   ECF 136-11 at 2-3, Ex. 284 ¶¶ 3-6. Mr. Ransom also explained that Mr.

13   McNelton "took responsibility for the guns because he did not want me

14   to get in trouble with the law." Id. Mr. Ransom's testimony would have

15   completely negated this crime as an aggravating factor and instead

16   made it mitigating: it would have shown that Mr. McNelton tried to

17   help out a younger cousin, by putting himself at risk. See Jones v.

18   State, 707 P.2d 1128, 1132 n.2 (Nev. 1985) ("Detailed information

19   regarding prior convictions may work to the benefit of a defendant as

20   well as to his detriment.")

21       The State was also permitted to introduce evidence that Mr.

22   McNelton had been arrested in possession of a woman's watch and a

23   sawed-off shotgun. 10/12/93 TT at 4-5. The State presented no evidence

24   that Mr. McNelton had actually committed a bad act—for example, that

25   the watch was stolen, or that possession of the shotgun was illegal.[3]

---

[3] Although many people believe that sawed-off shotguns are always

1   Trial counsel should have challenged the admissibility of this evidence.

2           There is a reasonable probability that at least one juror would

3   have been persuaded to spare Mr. McNelton's life had they known that

4   the 1980 "offense" was actually a result of Mr. McNelton taking

5   responsibility for something he didn't do, and if they had never heard

6   about the 1977 arrest. This is especially the case here, where the State's

7   case in aggravation rested primarily on Mr. McNelton's criminal

8   history, and the entire mitigation presentation consisted of one witness,

9   whose testimony took up less than eight transcript pages. See Wiggins,

10  539 U.S. at 524;  Mak v. Blodgett, 970 F.2d 614, 619 (9th Cir.1992) (per

11  curiam) ("[T]he issue for the jury is whether the defendant will live or

12  die. . . . To fail to present important mitigating evidence in the penalty

13  phase—if there is no risk in doing so—can be as devastating as a failure

14  to present proof of innocence in the guilt phase." (second alteration in

15  original)); Karis v. Calderon, 283 F.3d 1117, 1141-42 (9th Cir. 2002)

16  (finding prejudice where mitigation case presented at trial was weak

17  and mitigating evidence uncovered during habeas proceedings would

18  have explained defendant's conduct).

19          3.      Trial and appellate counsel should have challenged the
20                  State's use of the non-statutory aggravating evidence.

21          In addition to investigating the prior bad acts, trial counsel should

22  have challenged them as unconstitutional. The State's case for death

23  relied on two aggravating circumstances. One (that the murder was

---

illegal, there are permits that allow possession of guns with shortened
barrels, depending on the length of the barrel. See Cal. Penal Code §
17170 (defining a "short-barreled rifle").

committed by a person  previously convicted of a felony involving the use or threat of violence against) was based on Mr. McNelton's prior convictions. ECF 137-5 (Ex. 297). The other (that the murder was committed by a person under a sentence of imprisonment) was based on Mr. McNelton's parole status. Id. None rested on the fact that Mr. McNelton had previously committed what the State characterized as "bad acts." Nevertheless, the day of the penalty hearing, the State announced that it planned to introduce additional bad acts during the penalty phase. 10/11/1993 TT at 11. Trial counsel conceded that the evidence was admissible, even though the defense had no notice of the State's intent to introduce it, and no way to refute it. Id.

Trial and direct appeal counsel were ineffective for failing to challenge the State's use of non-statutory aggravating circumstances during the penalty phase. The Nevada statute, as interpreted by the Nevada Supreme Court, permitting introduction at the penalty phase of "evidence outside the areas of aggravating circumstances," Allen v. State, 665 P.2d 239, 240 (Nev. 1983), is unconstitutionally vague. By allowing the jury to consider essentially anything as an aggravating circumstance, the Nevada statute violates the requirement that death penalty statutes furnish principled guidance for the sentencer's choice between death and a lesser penalty. See Maynard v. Cartwright, 486 U.S. 356, 363 (1988).

This is especially the case here, where the jury received no meaningful instruction on how to weigh the non-statutory aggravating evidence. ECF 150-9, State's Ex. 95. Instead, it was told only that the alleged bad acts were "character evidence." See id. at 35 (Instruction 31).

1          4.     Claim Five(C) is not defaulted.

2          After failing to raise default in its motion to dismiss, the State

3    now argues this claim is defaulted. See ECF 178 at 10. That argument

4    is waived. Alternatively, Mr. McNelton can overcome any default

5    because: (1) the Nevada Supreme Court applied an inadequate bar

6    when it failed to consider this claim during the first and second post-

7    conviction proceedings; and (2) Mr. McNelton's initial post-conviction

8    counsel was ineffective for failing to raise the claim.

9                  (a)     The State waived any procedural default
10                         argument regarding this claim when it failed to
11                         raise it in the motion to dismiss; moreover, this
12                         Court already ruled the claim is not defaulted.

13         Procedural default is an affirmative defense, which the State must

14    allege and prove. Bennett v. Mueller, 322 F.3d 573, 585 (9th Cir. 2003).

15    The State waived any argument that Claim 5(C) was defaulted when it

16    failed to raise this argument in either its motion to dismiss or its reply

17    in support of its motion to dismiss. See ECF 146 at 9 (motion to dismiss

18    listing claims that the State maintained were defaulted; list does not

19    include Claim 5(C)); ECF 170 (reply failing to raise issue).

20         Mr. McNelton pointed out in his opposition that the State had

21    "concede[d]" that "Claim Five (C) (trial counsel's ineffectiveness for

22    failing to investigate and challenge the State's penalty phase evidence

23    of prior bad acts)" was not procedurally barred. ECF 165 at 51. The

24    State did not dispute this characterization in its reply. See generally

25    ECF 170. The State cannot now avail itself of an argument it failed to

26    timely raise. See Vang v. Nevada, 329 F.3d 1069, 1076 (9th Cir. 2003)

27    ("Claims 4, 5, and 6 are not procedurally defaulted because the State

15

1  failed to rely on the default in its motion to dismiss and we find no
2  persuasive reason to excuse that waiver.").

3      Moreover, this Court denied the State's motion to dismiss with
4  respect to Claim Five(C), and ordered the State to answer the claim on
5  the merits. ECF 175 at 27-28. The State was free to file a motion to
6  reconsider if it believed this Court's order was incorrect. See Fed. R.
7  Civ. Pro. 59(e). Having failed to do so, the State must abide by this
8  Court's order, which is the law of this case. Thomas v. Bible, 983 F.2d
9  152, 154 (9th Cir.) ("[A] court is generally precluded from reconsidering
10 an issue that has already been decided by the same court . . .").

11     Nevertheless, the State is now backpedaling, first by answering a
12 claim that was not raised,[4] and then by arguing that Claim Five (C)
13 should have been dismissed as procedurally defaulted.

14     Rather than devote time to a claim that was not even raised, as
15 the State has done, Mr. McNelton instead addresses the substantive
16 issues that were raised in Claim Five(C), as this Court ordered. See
17 ECF 175 at 27-28.

18         (b)    Mr. McNelton can overcome any default.
19     Largely for the reasons that Mr. McNelton outlined in his
20 opposition to the State's motion to dismiss, Mr. McNelton can overcome

---

[4] Mr. McNelton raised a claim that the trial court erred by failing to
conduct a Petrocelli hearing regarding prior bad acts that were
presented during the guilt phase, and that appellate counsel was
ineffective for failing to raise that claim. ECF 133 at 141-43 (Claim
Eleven(E). The State has answered a claim that trial counsel was
ineffective for failing to object to the trial court's admission of erroneous
evidence. ECF 178 at 6-10. That ineffectiveness claim was not raised in
the federal petition.

1   any default. <u>See</u> ECF 165 (opposition to State's motion to dismiss).[5]

2   First, the Nevada Supreme Court applied bars that were neither

3   adequate nor independent when it refused to consider this issue on the

4   merits. <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. at 750. Mr. McNelton

5   raised Claim Five(C) on appeal from the denial of his first-post

6   conviction proceeding. ECF 97-5 at 23-24, State's Ex. 20.3 at 65-66

7   (arguing that trial counsel were "ineffective because they failed to object

8   to the State's use of non-statutory aggravating circumstances during

9   the penalty phase"); ECF 97-4 at 13-14, State's Ex. 20.2 at 28-29. The

10  Nevada Supreme Court declined to address this claim on the merits

11  because McNelton violated a procedural rule by not raising it in the

12  proceeding below. <u>McNelton</u>, 990 P.2d at 1275-76. However, the court

13  also explained the rule was "not absolute." ECF No. 152-29 at 2-3,

14  State's Ex. 178 at 1-2. The Court could "elect" to consider claims of

15  "constitutional dimension." <u>Id.</u> Thus, the rule is neither adequate nor

16  independent of federal law. <u>See</u> generally ECF 165 at 83-94 (opposition

17  to motion to dismiss arguing that procedural rules could not bar federal

18  review). Similarly, when the Nevada Supreme Court refused to consider

19  this claim for a *second* time during the second post-conviction

20  proceedings, it applied inapplicable, and inadequate, default rules. <u>Id.</u>

21  at 91-107.

22  Second, Mr. McNelton can overcome any default based on

---

[5] Mr. McNelton recognizes that this Court already ruled that Mr. McNelton could not overcome any default with respect to the other defaulted claims. However, to ensure that this issue is properly preserved should this Court decide to consider the State's belated argument, Mr. McNelton raises it here.

1   ineffectiveness of initial post-conviction counsel. <u>Martinez v. Ryan</u>, 132
2   S. Ct. 1309, 1315 (2012) (holding that a petitioner can overcome a
3   default by showing that: (1) initial-collateral counsel rendered
4   ineffective assistance of counsel under the standards set forth in
5   <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); and (2) the underlying
6   ineffective assistance of trial or appellate counsel claim is a "substantial
7   one, which is to say that the prisoner must demonstrate that the claim
8   has some merit").

9        Because initial post-conviction counsel failed to raise the
10   meritorious issue contained in Claim Five(C) in Mr. McNelton's initial
11   post-conviction petition, the state court defaulted it. Post-conviction
12   counsel's performance was deficient—he wholly failed to investigate Mr.
13   McNelton's case and failed to raise several meritorious claims, including
14   this one. <u>See</u> ECF 165 at 107-14. This claim has at least "some merit,"
15   so Mr. McNelton can show that post-conviction counsel's deficient
16   performance prejudiced him. <u>See</u> sections III.A.1-3, above.

17   B.   Trial counsel was ineffective for allowing testimony
18        regarding Mr. McNelton's custody status and for
19        taking the stand and rebutting the testimony of a
20        defense witness who testified about Mr. McNelton's
21        custody status (Claim Six(D)).

22        In Claim Six(D), Mr. McNelton argues that trial counsel was
23   ineffective for calling himself to rebut part of the testimony from the
24   very witness he called to support Mr. McNelton's alibi defense. <u>See</u> ECF
25   133 at 81. Without obtaining a waiver from Mr. McNelton, Mr.
26   Christensen chose to defend himself personally rather than maintain
27   his sole allegiance to Mr. McNelton's defense. His conduct fell below

18

1  prevailing professional norms and prejudiced Mr. McNelton. <u>Strickland</u>
2  <u>v. Washington</u>, 466 U.S. 668, 687 (1984).

3      1.    Defense counsel took the stand to defend himself,
4            undermining Mr. McNelton's alibi defense.

5      At trial, the defense called Michael Turner as an alibi witness.
6  Mr. Turner testified on direct that he had not seen Mr. McNelton since
7  the day of the murder, May 13, 1989. <u>Id.</u> at 107, 109, 112, 127. The
8  prosecutor did not ask about this testimony on cross. However, during
9  re-direct, Mr. Christensen asked Mr. Turner only one question:
10  "[W]hen's the last time you saw my client?" <u>Id.</u> at 127. Mr. Turner
11  answered, "May 13, [1989]." <u>Id.</u>

12      In response, the State re-cross-examined Mr. Turner about when
13  he last saw Mr. McNelton, and elicited testimony that Mr. McNelton
14  was incarcerated.[6] After an unrecorded defense-requested sidebar
15  conference, Mr. Turner admitted that he actually had visited and
16  spoken with Mr. McNelton in jail in 1992, after traveling from
17  California to Las Vegas to see him. <u>Id.</u> at 128. After Mr. Turner denied
18  "fabricating" his testimony, the prosecutor asked "[d]id anybody ask you
19  not to say anything about his visit?" <u>Id.</u> at 130. After another
20  unrecorded defense-requested sidebar, Mr. Turner responded to the
21  prosecutor's question by naming "Attorney Drew [Christensen]." <u>Id</u>. Mr.

---

[6] Although the prosecutor had previously elicited testimony from Officer
Berni, that Mr. McNelton had been arrested in a matter unrelated to
the capital office, in response to a call of "shots fired from a residence,"
10/6/1993 TT at 100-01, 107 (describing call and picture of Mr.
McNelton that was taken "at the Clark County Detention Center"), this
testimony did not indicate that Mr. McNelton was permanently
detained.

19

1   Christensen attempted a second re-direct examination of Mr. Turner
2   where he tried to clarify that although he had told Mr. Turner not to
3   reveal Mr. McNelton's incarceration status, he had also told Mr. Turner
4   to tell the truth. See id. at 132.

5         Mr. Christensen then decided to take the stand himself to rebut
6   Mr. Turner's testimony and defend his conduct. See id. at 147. Mr.
7   Christensen testified that he had had legal experience as a defense
8   attorney and a prosecutor, and explained that it is a normal defense
9   strategy to tell witnesses not to reveal the incarceration status of
10  defendants because it could damage the presumption of innocence. See
11  id. at 148-49. Mr. Christensen denied telling Mr. Turner not to talk
12  about the conversation that he had had with Mr. McNelton, and
13  reiterated that he had told all defense witnesses to testify truthfully. Id.
14  at 149. Thus, through defense counsel's own conduct highlighted for the
15  jury that Mr. McNelton was in custody.

16        2.    Trial counsel's decision to put his own interests above
17                Mr. McNelton's constituted deficient performance.

18        Trial counsel admitted that his rash decision to take the stand
19  "could undermine the alibi defense." ECF 91-2 at 389 (Ex. 152 ¶ 10). He
20  also admitted that he did not discuss the decision with Mr. McNelton or
21  obtain a waiver. Id. His conduct constituted deficient performance
22  under Strickland. Courts have repeatedly recognized that the right to
23  effective assistance of counsel includes a right to undivided loyalty.
24  Cuyler v. Sullivan, 446 U.S. 335, 355 (1980); Fitzpatrick v. McCormick,
25  869 F.2d 1247, 1251 (9th Cir. 1989) ("The guarantee of effective
26  assistance of counsel comprises two correlative rights: the right to
27  reasonably competent counsel and the right to counsel's undivided

1   loyalty.").

2          Although Mr. Christensen ostensibly took the stand to explain
3   that he only warned Mr. Turner not to mention Mr. McNelton's custody
4   status, he necessarily had to rebut Mr. Turner's testimony to
5   accomplish his objective, thereby casting undue doubt upon Mr. Turner
6   as an alibi witness. Because Mr. McNelton had asserted an alibi defense
7   that he was in California at the time that the murder took place, see
8   10/5/93 TT at 12, and his alibi was premised, in part, upon the
9   testimony of Michael Turner, trial counsel's attempt to rehabilitate
10  himself undermined the defense case.

11         Trial counsel should have consulted with Mr. McNelton prior to
12  taking the stand. Trial counsel has a duty to consult with his client,
13  especially regarding a "fundamental trial decision within the client's
14  control." Summerlin v. Schriro, 427 F.3d 623, 638 (9th Cir. 2005); see
15  also Nev. R. Prof. Conduct 3.7 (a) (lawyer as witness). While not all
16  decisions about what witnesses to call are fundamental, if anything is
17  fundamental, the issue of whether trial counsel should testify *against* a
18  defense witness certainly is.

19         3.    Trial counsel's deficient performance prejudiced Mr.
20               McNelton by undermining the alibi defense.

21         Trial counsel's decision to put his own interests above Mr.
22  McNelton's prejudiced Mr. McNelton. It highlighted for the jury that he
23  was in custody. It undermined a key alibi witness. It made it appear to
24  the jury that Mr. McNelton's counsel was more concerned for his own
25  reputation than about Mr. McNelton's defense. There is a reasonable
26  probability that the outcome of the case would have been different had
27  trial counsel performed competently. See Brown v. Myers, 137 F.3d

21

1 1154, 1157 (9th Cir. 1998) (prejudice established where alibi witnesses

2 that tended to support defense were not called); <u>Alcala v. Woodford</u>, 334

3 F.3d 862, 872 (9th Cir. 2003) (prejudice established by trial counsel's

4 deficient presentation alibi defense).

5      4.   The Nevada Supreme Court unreasonably rejected this
6           claim by concluding that trial counsel's decision was
7           "tactical."

8      The Nevada Supreme Court's determination that Mr. Christian's

9 decision to take the stand was "tactical" without any evidentiary

10 support for that conclusion, was an unreasonable determination of facts

11 and an unreasonable application of <u>Strickland</u>, 466 U.S. at 687. During

12 the state post-conviction hearing, trial counsel never suggested that his

13 decision to take the stand was made after a reasonable investigation, or

14 that it was "tactical" or "strategic." <u>See</u> ECF 96-21 & 92-22, State's Ex.

15 17.1, 17.2. During federal post-conviction proceedings, Mr. Christensen

16 admitted that his decision could have *hurt* the defense, and that he

17 failed to consult with Mr. McNelton about it. ECF 91-2 at 389, Ex. 152 ¶

18 10. Thus, the evidence before this Court belies any suggestion that Mr.

19 Christensen's decision was a tactical one warranting deference.

20     The Nevada Supreme Court never actually articulated what

21 reasonable "strategy" would permit an attorney to undermine his own

22 defense witness. In fact, the Nevada Supreme Court called the decision

23 "tactical," without any evidentiary support for that conclusion, and

24 ended its analysis there. Clearly established federal law requires more.

25 <u>See</u> <u>Strickland</u>, 466 U.S. at 687. It requires that a tactical decision be

26 made after *reasonable investigation,* and be *objectively reasonable.* <u>Id.</u>;

27 <u>Correll v. Ryan</u>, 539 F.3d 938, 951 (9th Cir. 2008) ("In short, to the

22

1   extent that defense counsel had a strategy at all, it cannot be
2   considered an objectively reasonable strategy."). Trial counsel's decision
3   to take the stand was neither informed nor reasonable. It was a decision
4   made to protect his own interest. It was objectively unreasonable. The
5   Nevada Supreme Court's decision was based on an unreasonable
6   determination of facts, and an unreasonable application of Strickland.

7   C.   The trial court violated Mr. McNelton's right to due
8        process by improperly admitting prior bad act
9        evidence during the guilt phase (Claim Eleven(E)).

10      In Claim Eleven(E), Mr. McNelton argues that the trial court
11  deprived him of due process by permitting Officer Berni to testify about
12  the 1989 "shots fired" incident. Trial counsel asked for a hearing on the
13  admissibility of this evidence pursuant to Petrocelli v. State, 692 P.2d
14  503 (Nev. 1985), but the trial court improperly refused a hearing.

15      Officer Berni testified that he was dispatched to a home on Hart
16  Street where Mr. McNelton was staying on February 24, 1989, in
17  response to a call of "shots fired from a residence." 10/7/93 TT at 100-
18  101. Officer Berni also testified that he encountered Mr. McNelton and
19  William Bircher at the residence: that Mr. McNelton said he "stayed" at
20  that address; that both gave consent to enter for a search; and that
21  Berni found a shotgun and a pistol on the bedroom floor. Id. at 106.
22  Officer Berni identified one weapon as a Mossburg shotgun and the
23  other as an AMT Backup .380 semiautomatic pistol. Id. Officer Berni
24  confiscated the weapons and placed them in his trunk. Id.

25      After Officer Berni's testimony, trial counsel requested a mistrial,
26  arguing that the jury would now infer, based upon the shots fired call,
27  the seized guns, and the fact that Mr. McNelton was arrested and

1   photographed at the jail, that Mr. McNelton had fired the shots. 10/6/93

2   TT at 134.  The trial court denied the motion for a mistrial. Id. at 138.

3         During post-conviction proceedings, the Nevada Supreme Court

4   recognized that, prior to allowing Berni's testimony, the trial court

5   should have held a hearing, as requested by counsel. McNelton, 990

6   P.2d 1263. However, the court held that the error was harmless,

7   because the result of the trial would have been the same "if the court

8   had not admitted Officer Berni's testimony about the police response to

9   the shots fired call, and it denied Mr. McNelton's ineffective assistance

10  of counsel claim. Id. at 406.

11        The Nevada Supreme Court's harmlessness analysis was

12  incorrect. Had this evidence been excluded, there is a reasonable

13  probability that the jury would not have found Mr. McNelton guilty. See

14  Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).

15  **D.   Trial and appellate counsel were ineffective for**

16  **      failing challenge the trial court's refusal to dismiss**

17  **      Mr. McNelton's case based on a violation of the**

18  **      Interstate Agreement on Detainers Act (Claims**

19  **      Six(F) and Fourteen(I)).**

20        In Claims Six(F) and Fourteen(I), Mr. McNelton argues that trial

21  and appellate counsel were ineffective in litigating Mr. McNelton's

22  claim under the Interstate Agreement on Detainers Act (IAD). The trial

23  court dismissed Mr. McNelton's case with prejudice based on the

24  prosecutor's admission that Mr. McNelton had mailed him the

25  paperwork necessary to invoke Mr. McNelton's rights under the

26  Interstate Agreement on Detainers Act (IAD), but the State had failed

27  to timely bring him to trial. After the adverse ruling, the prosecutor

completely contradicted his in-court statement and said that he had *not* received the required paperwork.

Trial counsel deferred to the prosecutor's newly-conceived excuse for failing to timely bring Mr. McNelton to trial, and the trial court ultimately vacated its order dismissing the case. Appellate counsel failed to raise this issue on appeal. Trial and appellate counsel were both ineffective for failing to challenge the prosecutor's highly suspect, and factually unsupported, recantation and the trial court's blind acceptance of that recantation. <u>Strickland</u>, 466 U.S. at 687.

        1.     The IAD mandates that a court "shall" dismiss a case with prejudice for failure to comply with the law.

The IAD is a compact among 48 States, the District of Columbia, and the Federal Government which allows a "participating State to gain custody of a prisoner incarcerated in another jurisdiction, in order to try him on criminal charges." <u>Reed v. Farley</u>, 512 U.S. 339, 341 (1994). The IAD, "although a state law, is also a 'law of the United States' within the meaning of § 2254(a)." <u>Id.</u> at 345-46.

The speedy trial provision of the IAD provides in relevant part:

> [A] prisoner shall be brought to trial within one hundred eighty days after the prisoner shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of imprisonment and the prisoner's request for a final disposition to be made of the indictment, information or complaint.

IAD Article III, codified at Nev. Rev. Stat. § 178.620. If a state fails to comply with the speedy trial provision, the court "shall enter an order

1    dismissing the [indictment] with prejudice." <u>Id.</u>

2       This provision is based on concerns about a defendant's right to a

3    speedy trial. <u>Reed</u>, 512 U.S. at 352. Indeed, before the IAD was passed,

4    "detainers were allowed to remain lodged against prisoners for lengthy

5    periods of time, quite often for the duration of a prisoner's sentence."

6    <u>United States v. Mauro</u>, 436 U.S. 340, 358-59 (1978).

7
8
9
10          2.    The trial court dismissed the case with prejudice based on the prosecutor's representations but vacated its order when the prosecutor retracted his statements.

11       The trial court initially dismissed Mr. McNelton's case based on a

12    violation of the speedy trial provision of the IAD. The basis for the

13    district court's dismissal of the case for the IAD speedy trial violation

14    was straightforward—it was undisputed that: (1) Mr. McNelton had

15    mailed the required paperwork; and (2) the State had failed to bring

16    him to trial within 180 days.[7]

17       The State indicted Mr. McNelton on June 16, 1989. ECF 147-4,

18    State's Ex. 2. He was arrested on December 15, 1990, in Los Angeles,

19    CA, on unrelated charges and notified of Nevada's detainer on January

20    9, 1991. Ex. 344 at 15.[8]  He invoked his rights under the IAD on June

---

[7] In some of the state court briefing, the State refers to a 120-day time limitation. This limitation applies to Article IV of the IAD, which applies when a prisoner refuses to waive extradition. In its initial opposition to Mr. McNelton's motion to dismiss, the State argued that Article IV should apply. <u>See</u> ECF 91-2 at 877, Ex. 208.

[8] While both the State and Mr. McNelton have previously filed with this Court copies of McNelton's motion to dismiss, neither of the prior versions of the motions included the exhibits. Mr. McNelton is therefore re-filing the motion with the accompanying exhibits.

19, 1991, at the latest. Id.  He was not extradited until December 17, 1991, after the 180-day speedy trial period had expired. Id. at 13 (noting that State would pick Mr. McNelton up on December 17, 1991).

On June 1, 1992, trial counsel filed a motion to dismiss the charges against Mr. McNelton on the ground that State failed to conduct Mr. McNelton's trial within 180 days of June 19, 1991, the date that Mr. McNelton caused his form, invoking his Article III speedy trial rights, to be delivered to the State of Nevada. Ex. 344. The motion included an affidavit from the California Department of Corrections (CDOT) custodian of records, swearing that the IAD forms were in the CDOT records. Id. at 13. Several of the forms were dated May 31, 1991, but according to Mr. McNelton, they were sent in on June 19, 1991, at the latest. Id. at 8, 31.

The State opposed the motion on various grounds, including: (1) that because it obtained a governor's warrant, the matter was not governed by Article III of the IAD; and (2) that it could ignore the Article III time limitation because "the defendant tolled" the period through the use of pretrial motions and oral acquiescence." ECF 91-2 at 882, Ex. 208 at 5. Nowhere in its motion did the State argue that it had not received the required paperwork. Id. Instead, the State explained that it had processed the extradition as "expeditiously as possible." Id. at 886.

At the hearing on the motion, the State affirmatively acknowledged that Mr. McNelton had sent the forms invoking his rights under the IAD in June 1991:

> THE COURT:     When was the real Form 2 that he did sign sent?

27

| | MR. OWENS: | It was sent in June. It was signed on or about June 19, 1991. |
|---|---|---|
| | MR. GIBSON: | That's correct. |
| | THE COURT: | June 19th? |
| | MR. GIBSON: | Yes. |
| | MR. OWENS: | About three months after the State had sent their paperwork under Article 4 to the California institution. |

ECF 91-2 at 888, Ex. 209 at 6-7. On July 17, 2002, the trial court granted the motion to dismiss the murder charge against Mr. McNelton with prejudice on the ground that 180 days had passed since June 19, 1991, the date that the State admitted that Mr. McNelton had sent the last form required to invoke his rights under Article III (Form 2). ECF 91-2 at 902-03, Ex. 210 at 2-3.

After the trial court dismissed the case, the State filed a motion for rehearing, attaching an affidavit from the prosecutor recanting the statement he made during the hearing. ECF. 91-2 at 928, Ex. 211 at 23. In an affidavit, Mr. Owens declared that he had "erroneously advised the court that two separate sets of demands for speedy trial had been prepared or sent by the defendant" because he had "misinterpreted the forms that were attached to the defendant's motion to dismiss." Id. Mr. Owens further declared that the State was only aware of the existence of one set of forms—those which were attached to the Motion to Dismiss. Id. Mr. Owens finally declared that to his knowledge, and to the knowledge of all other District Attorney employees, Mr. McNelton's IAD forms were never sent to the Clark County District Attorney. Id.

28

1    The prosecutor's post-hearing recantation was not the only
2    suspect information in the rehearing motion. The motion contained an
3    affidavit from Clark County Assistant District Attorney Nadine
4    Mulkey, the Clark County District Attorney Extradition Coordinator,
5    containing hearsay statements that she was told by "Sherry" and
6    "Linda" from the Cocoran, California, prison that Mr. McNelton failed
7    to waive his extradition as required by Article III. ECF 91-2 at 925-27,
8    Ex. 211 at 20-22. Ms. Mulkey declared that she had never received Mr.
9    McNelton's speedy trial request. Id. at 927, Ex. 211 at 22. The State did
10   not produce any documentation to prove its allegations. The
11   documentation that the court already had in front of it suggested that
12   much of the information in the affidavit was incorrect. For example, the
13   affidavit provided dates that ADA Mulkey claimed to have contacted
14   the California prison. ECF 91-2 at 925, Ex. 211 at 20. The California
15   prison records did not reflect these contacts, even though it recorded
16   other contacts. See Ex. 344 at 13 (listing "subsequent actions and
17   telephone contacts related to Nevada's detainer").

18         Despite the issues with the State's rehearing motion, the trial
19   court granted the motion and vacated its earlier order. ECF 91-2 at 937,
20   Ex. 212. It limited the rehearing to the issue of whether Mr. McNelton
21   was "under a term of imprisonment" given that California had granted
22   him parole (but not released him from prison) on December 15, 1991, a
23   new argument the State raised in its rehearing motion. Id. at 938, Ex.
24   212 at 2.

25         In the meantime, the State also appealed the trial court's order,
26   even though it had been vacated. The Nevada Supreme Court dismissed
27   the appeal, noting that there was no order to appeal from since the trial

29

1    court had already vacated its order of dismissal. ECF 136-7, Ex. 280. In
2    its order of dismissal, the Nevada Supreme Court indicated in a
3    footnote that the trial court during rehearing may consider the newly
4    decided case, Fex v. Michigan, 507 U.S. 43 (1993). See ECF 136-7, Ex.
5    280. The Court in Fex held that the 180-day clock under Article III of
6    the IAD does not start to run until the State *actually receives* the
7    defendant's invocation of his rights under the Act. 507 U.S. at 52.

8        A few days after the Nevada Supreme Court issued its opinion
9    dismissing the improperly-filed appeal, the trial judge put the rehearing
10   on its calendar. The Deputy Public Defender assigned to the case, Mr.
11   Gibson, was not available for the calendar call, because he was
12   "working the elections." ECF 136-8, Ex. 281. The Public Defender who
13   covered the hearing asked the court to schedule the argument for the
14   following week to "give [Mr. Gibson] an opportunity to review the Fex
15   case." Id. The judge refused, explaining, "I just happen to have more
16   time this week." Id. The judge then went on to tell the attorneys that
17   Fex was "dispositive"; that he thought Mr. Gibson "will agree that it's
18   dispositive" despite not agreeing with the case; and that the State
19   "won't need witnesses." Id. He set the hearing for two days later. Id.

20       The entire rehearing takes up less than two transcript pages. ECF
21   91-2 at 940-42, Ex. 213 at 1-2. Trial counsel presented no argument. Id.
22   He simply stated, "I've read the case and I'm well aware that it is
23   dispositive, your Honor." Id.  The trial court, upon reconsideration,
24   denied the motion to dismiss. Id. There was no argument regarding
25   whether Mr. McNelton was imprisoned—which was the issue actually
26   set for rehearing.

3.    Trial and appellate counsel should have challenged the State's hearsay evidence and the prosecutor's post-hoc repudiation of his statement that he received the required paperwork.

Fex was not, in fact, dispositive of the motion to dismiss. There were considerable factual disputes—centered on the State's shifting story—that needed to be resolved before the trial court could properly decide the motion. The State's bare representation that it had not received the required paperwork, which contradicted its prior admissions, was an insufficient basis for denying the motion. Trial and appellate counsel were ineffective for failing to litigate this issue. See Strickland, 466 U.S. at 691.[9]

Trial counsel should have demanded an evidentiary hearing. Trial counsel has a duty to investigate viable defenses, including the use of an evidentiary hearing, when necessary. Where trial counsel fails to do so, he is ineffective. Cf. Avila v. Galaza, 297 F.3d 911, 919 (9th Cir. 2002) ("We have repeatedly found that a lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrate[s] his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." (quotations and alterations omitted)). Appellate counsel was similarly ineffective for failing to raise this meritorious issue on appeal. See Smith v. Murray, 477 U.S. 527, 535-36

[9] Because the Nevada Supreme Court did not reach the performance prong of Strickland, this Court must review that prong de novo. Panetti v. Quarterman, 551 U.S. 930, 948 (2007); Wiggins v. Smith, 539 U.S. 510, 528-29 (2003). As discussed below, see section III.D.4, the Nevada Supreme Court unreasonably rejected this claim based on prejudice.

1   (1986) (applying <u>Strickland</u> to claim ineffectiveness of appellate

2   counsel).

3         There is a reasonably probability that an evidentiary hearing

4   would have revealed that the State received the required paperwork,

5   which would have mandated dismissal under <u>Fex.</u>

6         First, there were questions about ADA Owen's contradictory

7   statements. He originally said that Mr. McNelton had sent the required

8   documents in June 1991. ECF 91-2 at 895, Ex. 209. After the trial court

9   granted the motion to dismiss, ADA Owens signed an affidavit claiming

10  that he had "misinterpreted" the forms and that the State had never in

11  fact received the relevant documents.  ECF 91-2 at 928, Ex. 211 at 23.

12  Courts have repeatedly emphasized that post-hoc recantations of

13  witness testimony are unreliable. <u>See, e.g.,</u> <u>Allen v. Woodford</u>, 395 F.3d

14  979, 994 (9th Cir. 2005) (collecting authority for the proposition that

15  recantation testimony is "exceedingly unreliable"). There is no reason

16  why an attorney's recantation should be viewed any differently. At

17  minimum, trial counsel should have insisted on calling Mr. Owens to

18  the stand to cross-examine him on his convenient realization that he

19  had "misinterpreted" the relevant forms.

20        Second, there were questions about the hearsay affidavit of ADA

21  Mulkey. When the State filed its motion for reconsideration, the trial

22  court immediately recognized this issue:

23          Mrs. Mulkey's affidavit is clearly a hearsay affidavit. It is
24          one telephone conversation with unnamed employees in
25          California after another. Now, I can't consider that as
26          evidence of facts. I thought that if you were going to ask for
27          reconsideration you would have gone to California and
28          gotten an affidavit from somebody that knows what

32

1    happened.

2    ECF 91-2 at 947, Ex. 214 at 3. The Mulkey affidavit suggested—and the

3    State argued—that Mr. McNelton had not waived extradition, as

4    required to invoke his rights under Article III of the IAD, and that a

5    governor's warrant was required before California would extradite Mr.

6    McNelton since it was a capital case. ECF 91-2 at 925-26, Ex. 211 at 4.

7    These representations were unsupported by any documentation and

8    contrary to the forms Mr. McNelton *had* produced, which showed that

9    he had invoked his rights under Article III of the IAD. Moreover, ADA

10   Mulkey's statement, that someone told her a governor's warrant was

11   required, was an affirmative misstatement of California law, which

12   requires a government warrant for minor *noncapital* offenses, not

13   capital ones. See Cal. Penal Code § 1551.1 (allowing extradition without

14   a warrant "upon reasonable information that the accused stands

15   charged in the courts of any other state with a crime punishable by

16   death").

17        Third, the State continues to withhold evidence. To this day, the

18   State has refused to provide documentation that could prove or disprove

19   its theory, despite an order from this Court to produce relevant

20   documents. ECF 39 at 16-17 (granting discovery of "IAD documents").

21   The State has consistently refused to produced its correspondence logs,

22   which would show whether or not it received Mr. McNelton's IAD

23   paperwork. This Court should assume the logs would support Mr.

24   McNelton or at least grant an evidentiary hearing and require the State

25   to account for its opaqueness. Nev. Rev. Stat. § 47.250(3) (disputable

26   presumption "[t]hat evidence willfully suppressed would be adverse if

33

1    produced"); § 47.250(4) ("[t]hat higher would be adverse from inferior

2    being produced"); see Motion for Evidentiary Hearing (filed

3    concomitantly with this Reply).

4          Trial and appellate counsel were ineffective by failing to litigate

5    this issue. Had they effectively litigated it, there is a reasonable

6    probability that the trial court would have dismissed the case, or the

7    Nevada Supreme Court would have reversed its ruling.

8          4.    The Nevada Supreme Court's rejection of this claim
9                was contrary to, and consisted of an unreasonable
10               application of, Strickland.

11         The Nevada Supreme Court unconstitutionally held that neither

12   trial nor appellate counsel was constitutionally ineffective under

13   Strickland. The Nevada Supreme Court's determination otherwise was

14   contrary to, and an unreasonable application of, Strickland.

15               (a)    The Nevada Supreme Court unreasonably
16                      discounted the evidence Mr. McNelton had
17                      already produced and prosecution's failure to
18                      produce relevant evidence.

19         The Nevada Supreme Court wrongly rejected the trial counsel

20   ineffectiveness claim based on a faulty analysis of the prejudice prong of

21   Strickland. The Nevada Supreme Court unconstitutionally denied the

22   claim because Mr. McNelton did "not specify what evidence trial counsel

23   would have presented such that there is a reasonable probability that

24   the district court would have granted the motion." McNelton, 990 P.2d

25   at 1275.    The court's analysis failed to account for the evidence Mr.

26   McNelton had already presented—dated forms from the California

27   invoking his rights under the IAD. These documents were compelling

28   evidence that Mr. McNelton had sent the required documents to the

34

State, and called the State's version of events into question. However, because trial counsel conceded this issue, the trial court did not consider this evidence.

The Nevada Supreme Court's abbreviated analysis also failed to account for the State's failure to bring forth any documentary evidence showing either that (1) Mr. McNelton had refused extradition, or (2) it had never received the required documents. The most reasonable explanation for the State's failure to produce this evidence is that it simply does not exist. Indeed, there was evidence demonstrating that Mr. McNelton *had* waived extradition, contrary to the State's argument. In California, a prisoner challenging extradition is entitled to an identity hearing. Cal. Penal Code § 1551.2 (describing the process for an identity hearing). The State has never produced a record of this hearing, and undersigned counsel has never located one. Had Mr. McNelton challenged extradition, there would have been a record of an identity hearing.

The court's abbreviated analysis also fails to account for the effect of trial counsel's unqualified concession that <u>Fex</u> decided the issue in favor of the State. Had trial counsel not conceded the issue (and instead presented the arguments above), the trial court would have been obligated to at least inquire into the State's representations. Had the trial court scrutinized those representations, it would have learned of the factual and legal inaccuracies in Ms. Mulkey's hearsay affidavit. It would have ordered the State to produce the correspondence logs, which would have a record of the State's incoming mail. It would have required the State to call Ms. Mulkey and Mr. Owens to the stand, and the court may well have found them less than credible.

35

1    The Nevada Supreme Court's failure to consider the evidence
2    already in the record, and to evaluate it in light of trial counsel's
3    uninformed concession, was contrary to, and consisted of an
4    unreasonable application of, <u>Strickland.</u>

5    Trial counsel should have requested an evidentiary hearing. There
6    is simply no rational reason for trial counsel's failure to investigate and
7    challenge the State's newly-presented evidence. Trial counsel's
8    uninformed concession fell well below prevailing professional norms.
9    <u>See</u> section III.D.3, above.

10   Had trial counsel properly litigated this issue, Mr. McNelton's
11   case would have been dismissed. The Nevada Supreme Court's decision
12   was unreasonable.

13          (b)    The Nevada Supreme Court unreasonably held
14                 that appellate counsel was effective.

15   The Nevada Supreme Court concluded that because the district
16   court did not "abuse its discretion" when it denied the motion to
17   dismiss, appellate counsel was not ineffective for failing to raise this
18   issue. <u>McNelton v. State</u>, 990 P.2d 1263, 1275 (Nev. 2000). The Court
19   explained that "had appellate counsel argued on appeal that the district
20   court erred in considering the [Mulkey] affidavit because it was hearsay
21   and <u>Fex</u> did not apply, there is not a reasonable probability that this
22   court would have reversed the judgement." <u>Id.</u> With no explanation, the
23   Nevada Supreme Court also reasoned that the district court was not
24   "bound" by its statement that the Mulkey affidavit was unreliable. <u>Id.</u>
25   The Nevada Supreme Court's determination that the trial court could
26   rely on statements it characterized as unreliable was unreasonable.

27          Even if the trial court was not "bound" by its initial refusal to rely

36

1   on the hearsay information, it was required to explain a subsequent
2   decision to accept it wholesale. Neither the trial court nor the Nevada
3   Supreme Court has offered any reason why the trial court should have
4   accepted the questionable assertions in the affidavit after emphatically
5   rejecting them. The Nevada Supreme Court's bald statement that the
6   trial court could change its mind is beside the point. The relevant
7   inquiry—and one the Nevada Supreme Court unreasonably failed to
8   conduct—is *why* the trial court would have reversed its position on such
9   a critical issue.

10          The most likely answer is that it didn't. Instead, the trial court
11  simply misapprehended the effect of the <u>Fex</u> decision. While the <u>Fex</u>
12  decision was relevant to the motion, it was not dispositive. Competent
13  appellate counsel would have raised this issue on appeal. Had appellate
14  counsel properly raised this issue, Mr. McNelton's case would have been
15  dismissed with prejudice. It must be emphasized that the standard for
16  prejudice under <u>Strickland</u>, is an objective one, based on what the
17  probable effect of making a constitutional argument would be on an
18  impartial tribunal, "Act[ing] according to law," and not on "the
19  idiosyncrasies of the particular decision maker, such as unusual
20  propensities for harshness . . ." <u>Strickland</u>, 466 U.S. 694–95. The fact
21  that an appellate court, composed of elected judges, eventually rejected
22  Mr. McNelton's IAD claim, does not resolve the question. The issue of
23  prejudice is whether, if the constitutional issue had been raised, there
24  was a reasonable probability that a tribunal that "is reasonably,
25  conscientiously, and impartially applying the standards that govern the
26  decision," <u>Id</u>. at 695, would have accepted it. The Nevada Supreme
27  Court's decision was unreasonable.

1    **E.**   **The trial court's failure to dismiss his case pursuant**
2          **to the IAD violated Mr. McNelton's rights to a speedy**
3          **trial and prejudiced him (Claim Fifteen).**

4       In Claim Fifteen, Mr. McNelton argues he is entitled to relief

5  because the trial court blindly accepted the State's post hoc excuses for

6  failing to timely bring Mr. McNelton to trial and improperly denied his

7  motion to dismiss the case based on the State's violation of the IAD. See

8  ECF 133 at 160-68.

9       A violation of the IAD warrants habeas relief if the error amounts

10 to "a fundamental defect which inherently results in a complete

11 miscarriage of justice [or] an omission inconsistent with the

12 rudimentary demands of fair procedure." Reed v. Farley, 512 U.S. 339,

13 348 (1994) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). In

14 Reed, the Supreme Court rejected an IAD claim where the

15 defendant "registered no objection to the trial date at the time it was

16 set, and suffered no prejudice attributable to the delayed

17 commencement." Id. The Court specifically noted that the Reed case

18 gave it "no cause to consider" a situation where "a state court, presented

19 with a timely request to set a trial date within the IAD's 120-day

20 period, nonetheless refused to comply." Id. at 349.

21      Unlike the defendant in Reed, Mr. McNelton timely objected to his

22 unconstitutional confinement, see section III.D above, and suffered

23 prejudice because of the State's delay in bringing him to trial. Because

24 of the State's lengthy delay in bringing him to trial, Mr. McNelton was

25 without counsel in this case for a year and half. Mr. McNelton was

26 indicted on July 16, 1989. He was not extradited to Nevada until

27 December 1991—a year and a half after he was charged. Only after he

1   was extradited was he appointed counsel. 12/31/1991 TT; ECF 96-2 at 3,

2   State's Ex. 1 at 1. Thus, counsel was not able to even attempt to

3   interview any witnesses until well over a year after the crime.

4       This delay hindered Mr. McNelton's ability to prepare for trial,

5   contrary to the State's argument. See ECF 178 at 18. The crime

6   involved drug dealers—the victim was a drug dealer, and the witnesses

7   who testified at trial were drug dealers and users. Mr. McNelton's

8   defense was that a different drug dealer, Brian Jackson, was actually

9   the culprit. There was compelling evidence that Mr. Jackson was

10  dangerous. For example, one witness testified that just before the

11  victim was shot, Mr. Jackson had pointed a chrome .25 caliber pistol at

12  his head, in front of several onlookers, and ordered him not to sell

13  cocaine to someone in a waiting car. 10/5/93 TT at 105-10. The lengthy

14  delay in bringing Mr. McNelton to trial meant that Mr. Jackson had

15  ample opportunity to intimidate the eyewitnesses and ensure that they

16  would testify against Mr. McNelton instead of for him. Had the State

17  timely extradited Mr. McNelton and brought him to trial, trial counsel

18  may have been able to contact witnesses while they were still willing to

19  assist Mr. McNelton.

20      While Mr. McNelton's trial counsel later asked for continuances,

21  ECF 96-2 at 33, State's Ex. 1 at 10, these requests do not undermine

22  Mr. McNelton's argument. By the time counsel was finally appointed—a

23  year and half after Mr. McNelton was indicted, and after the 180 days

24  had passed—the damage was done. For the reasons described above,

25  the Nevada Supreme Court unreasonably rejected this claim. See

26  section III.D.4, above. Mr. McNelton is entitled to relief.

1  F.   Mr. McNelton's death sentence is invalid because the
2       "under sentence of imprisonment" aggravating
3       circumstance is invalid as applied to Mr. McNelton,
4       who was not imprisoned at the time of this crime
5       (Claim Thirteen).

6       In Claim Thirteen, Mr. McNelton argues that the under sentence
7  of imprisonment aggravating factor found by the jury is invalid. <u>See</u>
8  ECF 133 at 155-57. This aggravating factor cannot be constitutionally
9  applied to Mr. McNelton because he was on parole at the time of the
10 crime. Moreover, the State should be estopped from arguing it applies to
11 Mr. McNelton since it successfully argued during the IAD litigation,
12 that he was *not* under a sentence of imprisonment because he was on
13 parole.

14      1.    The "under sentence of imprisonment" aggravating
15            circumstance cannot be constitutionally applied to
16            cases where the defendant is on parole.

17      Nevada's pre-1977 death penalty statute required the imposition
18 of the death penalty when an inmate, sentenced to life without parole,
19 killed a person while in a prison. <u>See</u> Nev. Rev. Stat. § 200.030(1)(b)
20 (1973) (mandating death penalty for killings committed by "a person
21 who is under sentence of life imprisonment without possibility of
22 parole"). When the statute was amended to comply with the Supreme
23 Court's decision in <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976), the
24 legislature expanded the section to include all inmates who killed while
25 imprisoned. Nev. Rev. Stat. § 200.033(1); <u>see</u> Nevada Senate, 59th
26 Sess., Journal of the Senate at 425 (March 25, 1977) (proposing
27 amendment dropping phrase "without the possibility of parole"). The
28 purpose of this provision is fairly straightforward—to deter inmates

40

1   from killing while incarcerated, since inmates already facing severe
2   sanctions like lengthy sentences may otherwise have little left to lose.

3       At odds with the rationale behind this provision, the Nevada
4   courts have expanded the definition of "under sentence of
5   imprisonment" to include defendants who were not imprisoned, but who
6   have been placed on parole. See, e.g., Nevius v. State, 699 P.2d 1053,
7   1056 (Nev. 1985). Even under the broadest reading of the statute, "on
8   parole" cannot be constitutionally wrenched into meaning "under
9   sentence of imprisonment." This interpretation is invalid under the
10  guarantees of due process, equal protection, and the prohibition against
11  cruel and unusual punishments. U.S. Const. Amends. V, VI, VIII &
12  XIV.

13          (a)     Under the interpretation adopted by the Nevada
14                  Supreme Court, the aggravator does not permit
15                  sentencers to make a rational distinction among
16                  people convicted of murder.

17      With virtually no discussion, the Nevada Supreme Court has held
18  that the phrase "under sentence of imprisonment" includes offenders
19  who are on parole. E.g., Nevius v. State, 699 P.2d 1053, 1056 (Nev.
20  1985). This interpretation does not sufficiently narrow the class of
21  murders eligible for the death penalty. See Zant v. Stephens, 462 U.S.
22  862, 877 (1983) ("[A]n aggravating circumstance must "genuinely
23  narrow the class of persons eligible for the death penalty and must
24  reasonably justify the imposition of a more severe sentence on the
25  defendant compared to others found guilty of murder."). A sentencing
26  scheme must "channel the sentencer's discretion by 'clear and objective'
27  standards that provide 'specific and detailed guidance,' and that 'make

41

1    rationally reviewable the process for imposing a sentence of death.'"

2    Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (quotations omitted).

3    Capital punishment must "be limited to those offenders who commit 'a

4    narrow category of the most serious crimes' and whose extreme

5    culpability makes them 'the most deserving of execution.'" Kennedy v.

6    Louisiana, 554 U.S. 407, 420 (2008), opinion modified on denial of reh'g,

7    129 S. Ct. 1 (U.S. 2008) (quoting Roper v. Simmons, 546 U.S. 551, 568

8    (2005)). Someone on parole is not as culpable and therefore "most

9    deserving of execution," as a person who is actually imprisoned when he

10   kills the victim. See id.

11          The failure of the provision to adequately narrow the class of

12   people eligible for the death penalty results in the arbitrary and

13   capricious infliction of the death penalty. See Gregg, 428 U.S. at 192-95.

14   It is precisely this type of "freakish" and "wanton" imposition of the

15   death penalty that renders it unconstitutional under Furman and the

16   cases following it. Furman v. Georgia, 408 U.S. 238, 310 (1972).

17   Similarly, under the Nevada Supreme court's interpretation of "under

18   sentence of imprisonment," a juror could fairly characterize someone on

19   probation for marijuana possession as eligible for the death penalty.

20   This application is so arbitrary as to constitute an Eighth Amendment

21   violation. See id.; Robinson v. Schriro, 595 F.3d 1086, 1105 (9th Cir.

22   2010).

23          (b)    The Nevada Supreme Court's interpretation of
24                 the statute is contrary to the rule of lenity, which
25                 requires any ambiguity to be resolved in favor of
26                 the accused.

27          The Nevada death penalty statute permits the imposition of the

1   death penalty for offenders who are convicted of first degree homicide
2   while "under sentence of imprisonment." Nev. Rev. Stat. § 200.033(1).
3   Black's Law Dictionary defines "imprisonment" as the "act of confining
4   a person, especially in a prison" or the "quality, state, or condition of
5   being confined." Black's Law Dictionary (10th ed. 2014). Both of these
6   definitions focus on *confinement.* A parolee, who generally lives in a
7   place of his own choosing, is not confined in any sense of the word. See
8   id. (defining parole as the "conditional *release* of a prisoner from
9   imprisonment" (emphasis added)). He is subject to certain restrictions,
10  certainly, but those restrictions do not generally confine him.

11      Despite the statute's plain language, the Nevada Supreme Court
12  has held that in the death penalty context, "imprisonment" really
13  means imprisonment, on parole, or even on probation for a
14  misdemeanor offense. This interpretation is at odds with the rule of
15  lenity, which requires any ambiguities to be construed in the accused's
16  favor. See United States v. Nader, 542 F.3d 713, 721 (9th Cir. 2008)
17  ("The rule of lenity . . . 'is rooted in fundamental principles of due
18  process which mandate that no individual be forced to speculate, at
19  peril of indictment, whether his conduct is prohibited.'" (quoting Dunn
20  v. United States, 442 U.S. 100, 112 (1979))). Moreover, the statute, as
21  interpreted by the Nevada Supreme Court, is unconstitutionally vague.
22  See Godfrey v. Georgia, 446 U.S. 420, 428 (1980); Arave v. Creech, 507
23  U.S. 463, 471 (1993). The Nevada Supreme Court's strained
24  interpretation strips the term "imprisonment" of all substance, making
25  it a catch-all for anyone who may have some tenuous association with
26  the criminal justice system. See Bejarano v. State, 146 P.3d 265, 276
27  (Nev. 2006) (holding defendant "under sentence of imprisonment" where

1    defendant on probation for a misdemeanor offense).

2        2.    Even if the "under sentence of imprisonment"
3              aggravator could apply to defendants on parole, it
4              cannot be applied to Mr. McNelton, since the State
5              successfully argued pre-trial that he was *not* under a
6              sentence of imprisonment.

7        During the IAD litigation, the State argued that Mr. McNelton

8    was *not* imprisoned—even though he was still imprisoned in the

9    Califonia prison—because he had been granted parole. ECF 91-2 at 920-

10   23, Ex. 211 at 15-18. The trial court granted rehearing on this issue,

11   and eventually reversed its decision dismissing Mr. McNelton's case.

12   ECF 91-2 at 938, Ex. 212 at 2; ECF 91-2 at 940-42, Ex. 213 at 1-2.

13       The State's contrary argument during the penalty phase—that

14   parole constituted imprisonment, even where the defendant had been

15   released—was impermissible. The State should have been estopped

16   from making this contrary argument, and the Nevada Supreme Court's

17   consideration of this argument violated Mr. McNelton's right to due

18   process. See New Hampshire v. Maine, 532 U.S. 742, 749 (2001)

19   ("[W]here a party assumes a certain position in a legal proceeding, and

20   succeeds in maintaining that position, he may not thereafter, simply

21   because his interests have changed, assume a contrary position,

22   especially if it be to the prejudice of the party who has acquiesced in the

23   position formerly taken by him."); Cf. Salgado-Diaz v. Gonzales, 395

24   F.3d 1158, 1166 (9th Cir. 2005) ("We conclude that the government

25   should be estopped from relying on Salgado–Diaz's attempted re-entry

26   to remove him, essentially for the same reasons—and to the same

27   extent—that we have found his due process rights have been violated."),

1    as amended (Mar. 10, 2005).

2          3.    The jury's consideration of this invalid aggravator
3                prejudiced Mr. McNelton.

4          Nevada is a "weighing" state, in which the determination of death-

5    eligibility turns on the weighing of statutory aggravating circumstances

6    against the mitigating evidence. The jury also weighs the factors in

7    making the ultimate determination as to sentence. In a weighing state

8    where the aggravating and mitigating circumstances are balanced

9    against each other, it is constitutional error for the sentencer to give

10   weight to an unconstitutionally vague factor, even if other factors

11   remain. Sochor v. Florida, 504 U.S. 527, 532 (1992) ("In a weighing

12   State . . . there is Eighth Amendment error when the sentencer weighs

13   an 'invalid' aggravating circumstance in reaching the ultimate decision

14   to impose a death sentence.").

15         4.    The Nevada Supreme Court unreasonably rejected this
16               claim.

17         The Nevada Supreme Court rejected this claim by citing to its

18   precedent establishing that, in its view, "parole" means "under sentence

19   of imprisonment." McNelton, 990 P.2d at 1263 (1999). Its ruling does

20   not address whether the aggravating factor is unconstitutionally vague

21   and standardless. It ruling also fails to address whether the State

22   should have been estopped from arguing he was under a sentence of

23   imprisonment, given its prior position. While the State may be right

24   that much of the Nevada Supreme Court's analysis rested on state law,

25   see ECF 178 at 23, that observation does not mean that this claim is

26   meritless. The issue before this Court is not whether the Nevada

27   Supreme Court correctly interpreted its death penalty statute. The

45

1    issue is instead whether that interpretation can be constitutionally

2    applied to Mr. McNelton. For the reasons described above, it cannot.

3    The Nevada Supreme Court was unreasonable when it held otherwise.

4    G.    The prosecutor violated Mr. McNelton's right to due
5           process by improperly commenting on his allocution
6           and his right to remain silent (Claim Eight(C)).

7           In Claim Eight(C), Mr. McNelton argues that the prosecutor

8    committed misconduct by commenting on his allocution statement.[10]

9    After hearing the State's presentation of aggravating evidence, Mr.

10   McNelton wanted to respond to what he felt were mistakes in the

11   witnesses' testimony. See 10/12/93 TT at 26. The trial court told him he

12   could express remorse, but warned him not to "deny guilt or try to

13   revisit the guilt phase of the trial." Id. The trial court assured him that

14   if he followed the court's instructions, the statement "can never again be

15   used against" him. Id. at 27.

16          The prosecutor, of course, also heard these instructions and

17   assurances. Nevertheless, the prosecutor capitalized on the trial court's

18   limitation of the allocution statement by emphasizing Mr. McNelton's

19   supposed refusal to take full responsibility and his failure to testify

20   during the guilt phase. The prosecutor's improper remarks deprived Mr.

21   McNelton of due process, Darden v. Wainwright, 477 U.S. 168, 180

22   (1986), and violated his Fifth Amendment right to remain silent, Griffin

23   v. California, 380 U.S. 609, 614 (1965).

---

[10] Mr. McNelon also argued in Claim Fourteen(E) that appellate counsel
was ineffective for failing to raise this argument. As the State correctly
observes, see ECF 1478 at 19, appellate counsel did raise this issue. Mr.
McNelton therefore does not argue the merits of Claim Fourteen(E).

1.    The prosecutor complained that Mr. McNelton's allocution statement was "not subject to cross-examination," and that Mr. McNelton was remorseless.

Mr. McNelton, who is brain damaged and suffers from borderline intellectual functioning, gave a brief allocution statement, which stayed within the bounds the trial court established:

> Good morning, everyone, or I should say good afternoon. My name is Charles McNelton. I've been found guilty of first degree murder. And you've heard testimony of other offenses. And people come—came to tell you ladies and gentlemen of the jury about me. And, you know, I just wanted you to know that you can bring people to say bad things, good things about people. You know, everybody can say bad things and good things about people. No one never bad, as bad as everybody that says bad things against them that really says, you know. No one is never as good as people would make you believe that wants to say good things about 'em, you know.
>
> I'm here to tell you that I'm not the monster that the District Attorney would have you believe that I am, you know? They had different people to testify to that effect, that maybe you might think that I'm a monster. I'm not a monster. I'm a man just like you are human beings, you like you are.
>
> I made a lot of mistakes in my life. I can't say that everything I did was justifiable. I can't say that any of the bad things I did was justifiable. But I can say this: I'm not a monster. And, you know, a lot of people take one look at me being Black and bald-headed. I'm not a monster, and I just wanted the jury to know that. Thank you.

10/12/93 TT at 29-30.

The prosecutor seized on the statement in his closing argument and used it against Mr. McNelton, in direct contravention of the trial

47

court's instructions:

> *And then we heard from the defendant in his unsworn*
> *statement not subject to cross-examination*, and we learned
> quite a bit about this person that we will be punishing here,
> Mr. McNelton. This was his opportunity to express remorse,
> to say how sorry he was about Monica Glass, how he felt
> about taking a human life and his remorse.
>
> This was the opportunity for Mr. McNelton to tell you that,
> "I'm going to make this a positive. If you give me life without
> parole, I'm going to work hard in prison. I'm going to abide
> by the duties and the regulations that are imposed upon me.
> I'm going to make myself a better person."

10/12/93 TT at 85 (emphasis added). The prosecutor also pointed out

Mr. McNelton's failure to acknowledge or apologize for his prior

convictions. See id. at 85-86.

> 2.  The prosecutor's improper comments violated Mr.
>      McNelton's right to remain silent and his due process
>      right to a fair sentencing proceeding; the error was not
>      harmless.

The due process clause prohibits a prosecutor from commenting on

a defendant's decision not to testify during the guilt and penalty phases

of trial. Griffin v. California, 380 U.S. 609, 615 (1965) (guilt phase);

Estelle v. Smith, 451 U.S. 454 (1981) (penalty phase); Mitchell v. United

States, 526 U.S. 314 (1999) (penalty phase). Like other constitutional

errors, a Griffin error warrants reversal if the error had a substantial

and injurious effect on the sentencing. See Brecht v. Abrahamson, 507

U.S. 619, 637-38 (1993).

While a "direct comment about the defendant's failure to testify

always violates Griffin, a prosecutor's indirect comment violates Griffin

48

1    only if it is manifestly intended to call attention to the defendant's

2    failure to testify, or is of such a character that the jury would naturally

3    and necessarily take it to be a comment on the failure to testify." Hovey

4    v. Ayers, 458 F.3d 892, 912 (9th Cir. 2006) (quotation omitted).

5        The prosecutor's reference to the fact that Mr. McNelton's

6    statement was not subject to cross-examination was a direct reference

7    to his failure to testify, and therefore violated Griffin. While the State

8    suggests the comment was indirect, see ECF 178 at 21, it offers no

9    support for its contention—perhaps because there is none. Indirect

10   comments are ones that require additional inferences or logical steps—

11   unlike the prosecutor's unambiguous comment here. See, e.g.,

12   Peyer v. Duncan, 8 F. App'x 791, 795 (9th Cir. 2001) (unpublished)

13   (prosecutor's repeated statement that there was no "explanation" for

14   defendant's whereabouts during the crime was an indirect reference).

15       However, even if it was an indirect reference, it violated Griffin

16   because it was manifestly intended to call attention to Mr. McNelton's

17   failure to testify. See Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987);

18   United States v. Hill, 953 F.2d 452, 460 (9th Cir. 1991) (state may not

19   call attention to defendant's failure to testify). The State has offered no

20   explanation for other purposes of the prosecutor's comment, nor could

21   it. The comment was intended to criticize Mr. McNelton for exercising

22   his right to allocution instead of taking the stand to defend himself.

23       The prosecutor's other comments about Mr. McNelton's lack of

24   remorse—which took advantage of the court's assurances—also violated

25   Mr. McNelton's right to due process. See Darden v. Wainwright, 477

26   U.S. 168, 180 (1986). The prosecutor improperly used Mr. McNelton's

27   allocution statement against him, in direct contravention of the court's

1    earlier directions.

2        The error had a substantial and injurious effect on Mr. McNelton's

3    death sentence. Mr. McNelton presented only one witness during the

4    penalty phase—a pastor, whose testimony takes up less than eight

5    transcript pages. 10/12/93 TT at 31-38. Thus, Mr. McNelton's

6    statement, while brief, was the most significant portion of the defense's

7    penalty phase presentation. The prosecutor criticized his statement,

8    and urged the jury to sentence him to death because of it. The error was

9    not harmless. See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993);

10   cf. Alcala v. Woodford, 334 F.3d 862, 873 (9th Cir. 2003) (finding

11   prejudice when the prosecutor capitalized on defense

12   counsel's deficient performance and used it to his advantage in closing

13   arguments).

14       3.    The Nevada Supreme Court unreasonably rejected this
15             claim by misapplying Griffin.

16       The Nevada Supreme Court unreasonably concluded that the

17   prosecutor's attack upon Mr. McNelton's allocution did not violate Mr.

18   McNelton's right to remain silent. That determination was contrary to,

19   and an unreasonable application of, Griffin.

20       First, as described above, see section III.G.1-2, the remark was a

21   direct comment on Mr. McNelton's Fifth Amendment right to remain

22   silent. The Nevada Supreme Court's holding, that the comment was

23   indirect, was "contrary to" Griffin. 28 U.S.C. § 2254(d)(1).

24       Second, the Nevada Supreme Court's conclusion that the jury

25   would not "necessarily" view the remarks as a comment on Mr.

26   McNelton's failure to testify was an unreasonable application of Griffin.

27   The prosecutor complained that Mr. McNelton's statement was

"unsworn" and "not subject to cross-examination." The Nevada Supreme Court inexplicably held that the jury would view these comments as an argument that Mr. McNelton was "an unfeeling man." The record simply belies this suggestion. The comments were intended to emphasize to the jury that Mr. McNelton refused to testify.

## H.    The trial court erred by allowing the State to comment on Mr. McNelton's allocution after assuring him that the statement could not be used against him (Claim 11(B)).

In Claim 11(B), Mr. McNelton argues that the trial court improperly permitted the State to comment on his allocution, in contravention of his right to due process. After lulling Mr. McNelton into giving a statement by assuring him it can "never again be used against you," the court allowed the prosecutor to argue that his "unsworn statement" which was "not subject to cross examination" showed that he deserved to be executed.

The State argues that this claim is defaulted, but its argument is waived and without merit. Alternatively, Mr. McNelton can overcome any default.

### 1.    The trial court assured Mr. McNelton that his allocution statement would not be used against him but then allowed the state to use the statement against him.

As explained above, the trial court explained to Mr. McNelton that there was a difference between testifying under oath (which presumably would be used against him), and making an unsworn allocution statement (which would not):

There's a difference between making an unsworn statement

51

1    which can never again be used against you and taking the
2    stand and testifying to rebut what the officer had testified to.

3    10/12/93 TT at 27. Thus, the trial court explicitly assured Mr. McNelton
4    that his statement would not be used against him.

5        The State seizes upon the trial court's use of the word "again" to
6    argue that the trial court's assurances were accurate. ECF 178 at 28. In
7    the State's view, the use of the word "again" informed Mr. McNelton his
8    statement *could* be used against him, but only during his penalty
9    proceeding. This argument makes little sense, given that the State has
10   failed to articulate *any other proceedings* where the statement would be
11   relevant. The only proceeding that mattered was the penalty phase
12   proceeding. It is difficult to imagine what proceeding the State thinks
13   Mr. McNelton—or his trial counsel, for that matter—would have been
14   concerned about. Moreover, the judge was clearly differentiating
15   between a sworn statement and an unsworn one, not between the
16   penalty proceeding and some imagined (and yet unidentified) future
17   proceeding.

18       Despite assuring Mr. McNelton that his statement would not be
19   used against him, the trial court overruled an objection to the
20   prosecutor's argument that Mr. McNelton's statement showed that he
21   was remorseless and had failed to testify his own defense. 10/12/93 TT
22   at 85 (objecting on ground that argument was "outside the scope of
23   what the evidence showed"; court overruling objection, holding, "[h]e's
24   entitled to argue the evidence at the penalty hearing and the inferences
25   drawn therefrom. Your client exercised his right of allocution; he's
26   entitled to comment on it.").

1
2
3

    2.    The trial court's ruling deprived Mr. McNelton of due process and had a substantial and injurious effect on the sentence.

4

Due process guarantees a fair trial. A trial court's error can

5

therefore deprive a defendant of due process if it has a substantial and

6

injurious effect on the verdict. See Brecht v. Abrahamson, 507 U.S. 619,

7

637-38 (1993); Parle v. Runnels, 505 F.3d 922, 930 (9th Cir. 2007). For

8

the reasons described above—that Mr. McNelton's penalty defense

9

rested primarily on his statement; that McNelton relied on the trial

10

court's assurances; that the prosecutor's improper comments implicated

11

McNelton's Fifth Amendment right to remain silent—the errors require

12

this Court to grant Mr. McNelton's petition.

13

    3.    This claim is not defaulted.

14

After failing to raise default in its motion to dismiss, the State

15

now argues this claim is defaulted. See ECF 178 at 22 n.6. That

16

argument—which is inaccurate—is waived. Alternatively, Mr.

17

McNelton can overcome any default because: (1) the Nevada Supreme

18

Court applied an inadequate bar when it failed to consider this claim

19

during the second post-conviction proceedings; and (2) Mr. McNelton's

20

initial post-conviction counsel was ineffective for failing to raise the

21

claim.

22
23

    (a)    The State waived any argument that this claim is defaulted, and this claim, in fact, is not defaulted.

24

In a footnote, the State argues that this claim is procedurally

25

defaulted and should have been dismissed. ECF 178 at 22 n.6. The

26

State waived this argument by failing to raise it in its motion to

27

dismiss, and by failing to dispute Mr. McNelton's subsequent statement

53

1   that the State "concede[d]" this claim was not defaulted. <u>See</u> section

2   III.A.4, above; ECF 165 at 51. This Court's order holding this claim is

3   not defaulted is the law of this case. <u>See</u> section III.A.4, above. In any

4   event, the State's argument lacks any force—this claim was raised on

5   direct appeal and decided on the merits. <u>See</u> <u>McNelton</u>, 900 P.2d at 905

6   (court discussing claim titled "failure to advise of rights"); ECF 96-4 at

7   28-29, State's Ex. 3.2 at 58-59 (opening brief describing trial court's

8   instructions); ECF 96-7 at 19-23, State's Ex. 5.1 at 14-18 (reply brief

9   reiterating argument).

10              (b)    Mr. McNelton can overcome any purported
11                     default.

12        Even if Mr. McNelton defaulted this claim, he can overcome the

13   default. First, the bars the Nevada Supreme Court applied were not

14   adequate. <u>See</u> ECF 165 at 91-107 (opposition to motion to dismiss

15   arguing that default rules could not bar federal review). Second, Mr.

16   McNelton can overcome any default based on initial post-conviction

17   counsel's ineffectiveness. <u>See</u> <u>Martinez</u>, 132 S. Ct. at 1315. Initial post-

18   conviction counsel failed to conduct an extra-record investigation into

19   Mr. McNelton's case and filed a 30-page petition that included only one

20   exhibit—trial counsel's own affidavit describing a conversation with Mr.

21   McNelton. <u>See</u> ECF 165 at 107-14 (opposition to motion to dismiss

22   describing trial counsel's deficient performance). Trial counsel's failures

23   prejudiced Mr. McNelton, because he failed to raise this claim, which

24   has "some merit." <u>See</u> section III.H.1-2, above. This court should

25   therefore consider this claim de novo under <u>Martinez</u>, 132 S. Ct. at

26   1315.

1  I.   Appellate counsel were ineffective for failing to
2       communicate with Mr. McNelton during the direct
3       appeal proceedings (Claim Fourteen(E)).

4       In Claim Fourteen(E), Mr. McNelton argues that appellate
5  counsel ineffectively failed to communicate with Mr. McNelton during
6  the direct appeal process. As a result, several meritorious claims were
7  not raised.

8       It is undisputed that counsel never met with Mr. McNelton.
9  During the appellate proceedings. Mr. McNelton sent a letter
10 complaining that appellate counsel refused his calls, did not return his
11 letters, and never visited him. ECF 151-1, State's Ex. 121. Appellate
12 counsel did not dispute Mr. McNelton's characterizations, and instead
13 filed a motion to withdraw based on Mr. McNelton's complaints. Id.

14      During post-conviction proceedings, the Nevada Supreme Court
15 recognized that appellate counsel should have communicated with Mr.
16 McNelton, but held that counsel's error was not prejudicial because Mr.
17 McNelton had "not specified" which claims he would have raised had
18 counsel communicated with him.

19      Mr. McNelton was not required to demonstrate prejudice,
20 however, because counsel's abandonment constituted the complete
21 denial of counsel. United States v. Cronic, 466 U.S. 648, 662 (1984). The
22 State's suggestion that because appellate counsel filed a brief, he could
23 not abandon Mr. McNelton, is contrary to Cronic. The attorney in
24 Cronic showed up for trial, but his performance was woefully deficient.
25 Id. The same goes for Mr. McNelton's appeal. One need only read the
26 appeal—which borders on incomprehensible, and is little more than a
27 long outline—to see that appellate counsel was not acting as the counsel

1  guaranteed by the Sixth Amendment.

2  In addition, Mr. McNelton *did* specify the claims he would have

3  raised, had counsel performed effectively. The State's argument that

4  Mr. McNelton did not identify which claims he would have raised is

5  belied by the record. On appeal from the denial of his post-conviction

6  petition, there was an *entire section* in his brief devoted to the claims

7  direct appeal counsel failed to raise. ECF 97-6 at 18 (Ex. 20.4 at 87-91).

8  Thus, the Nevada Supreme Court's ruling—that Mr. McNelton

9  failed to describe the claims appellate counsel would have raised—was

10  based on an unreasonable determination of facts. In the opening brief,

11  Mr. McNelton described several claims that counsel ineffectively failed

12  to raise: (1) a challenge to Nevada's death penalty scheme, (2) a

13  challenge to hearsay evidence about the victim's autopsy, which was

14  performed by an employee with serious performance issues; and (3) a

15  challenge to the reasonable doubt instruction, which lowered the State's

16  burden of proof. Id. The Nevada Supreme Court never considered the

17  merits of these claims because post-conviction counsel ineffectively

18  failed to raise them.

19  Moreover, on de novo review (which applies since the claim was

20  unreasonably rejected, see Panetti v. Quarterman, 551 U.S. 930, 948

21  (2007)), this Court must also review the additional claims identified in

22  these post-conviction proceedings. In addition to the claims described

23  above, appellate counsel failed to raise substantial issues of trial court

24  error, trial counsel's conflict of interest, the IAD violation, the

25  prosecutor's use of gender-based preemptory strikes, and the lack of a

26  probable cause determination. See ECF 133 at 158-59.

27  It is apparent that trial counsel's deficient performance prejudiced

56

1   Mr. McNelton. There is a reasonable probability that the outcome of the

2   appeal would have been different had trial counsel raised these

3   meritorious claims.

4   J.      The cumulative effect of the constitutional errors in

5           Mr. McNelton's case violated his rights to due

6           process and a fair trial (Claim Nineteen).

7           This Court must assess each of the violations above to determine

8   whether Mr. McNelton was denied his constitutional rights. See Parle v.

9   Runnels, 505 F.3d 922, 927-28 (9th Cir. 2007); Alcala v. Woodford, 334

10  F.3d 862, 883, 893-94 (9th Cir. 2003); Mak v. Blodgett, 970 F.2d 614,

11  619 (9th Cir. 1992); Bailey v. Rae, 339 F.3d 1107, 1118-19 (9th Cir.

12  2003). It is clearly established that even if Mr. McNelton failed to

13  establish prejudice resulting from any one violation, this Court must

14  examine whether the cumulative effect of these errors violated Mr.

15  McNelton's right to due process and a fair trial. See Taylor v. Kentucky,

16  436 U.S. 478, 487-88 & n.15 (1978) (holding cumulative effect of

17  potentially damaging instructions and prosecution argument

18  violated due process guarantee of fundamental fairness); Chambers v.

19  Mississippi, 410 U.S. 284, 290 n.3 (1973) (reviewing claim of cumulative

20  error).

21          Assessing the prejudicial impact of the cumulative errors requires

22  an examination of the entire record, including both the evidence the

23  jury should have heard, but didn't, and evidence the jury heard but

24  should not have. In Parle v. Runnels, 505 F.3d 922, 927-28 (9th Cir.

25  2007), the court observed that all of the improperly excluded evidence

26  supported the defendant's argument that he lacked the requisite state

27  of mind, and all of the improperly admitted evidence undermined the

57

defense and the defendant's credibility. The combined effect of the errors rendered his defense "far less persuasive than it might have been." Id. (citing Chambers, 410 U.S. at 294). Therefore, the court concluded, the errors cumulatively had a substantial and injurious effect on the jury's verdict, and the state court's contrary conclusion was an unreasonable application of "clearly established due process law as determined by the Supreme Court." 505 F.3d at 929; see Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).

The cumulative effect of the errors above deprived Mr. McNelton of proceedings that were fundamentally fair and resulted in a constitutionally unreliable conviction and death sentence. Mr. McNelton's federal constitutional rights were violated by ineffective assistance of counsel at every level of his proceedings, erroneous rulings by the trial court, misconduct by the prosecution, an invalid aggravating circumstance, and myriad other problems which undermine the reliability of his conviction. Whether or not any individual error requires the vacation of the judgment or sentence, the totality of these multiple errors and omissions resulted in substantial prejudice to Mr. McNelton.

## IV.   CONCLUSION

Mr. McNelton was convicted and sentenced to death in violation of his rights under the United States Constitution. He is entitled to a writ of habeas corpus. He asks that this Court grant him a writ, and order the State to release him from his unconstitutional confinement.

# V.   CERTIFICATE OF APPEALABILITY

If this Court does not grant Mr. McNelton the writ, Mr. McNelton asks that it grant him a certificate of appealability (COA) on both the merits issues discussed above and the procedural issues decided in this Court's September 29, 2014, Order. It is appropriate to issue a COA if a petitioner makes a "substantial showing of the denial of a constitutional right." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). To meet this standard, a petitioner must show only that jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to warrant further examination. Id.

Several issues that this Court disposed of in its September 29, 2014, Order on the State's motion to dismiss meet this modest standard. For example, reasonable jurists could debate: (1) whether this Court properly held that Mr. McNelton could not overcome any procedural default based on initial post-conviction counsel's ineffectiveness; (2) whether this Court properly held that the state court's application of a procedural bar during the second post-conviction proceeding rendered the procedural bar applied during the first post-conviction proceeding irrelevant; (3) whether this Court properly refused to grant Mr. McNelton equitable tolling; and (4) whether several of Mr. McNelton's claims, including Claim One, were decided on the merits by the Nevada Supreme Court.

Mr. McNelton therefore requests a COA on any adverse procedural and merits rulings.

1  Respectfully submitted this 22nd day of April, 2015

2

3        RENE VALLADARES
4        Federal Public Defender

5

6

7     BY: */s/ Tiffani D. Hurst*
8        TIFFANI D. HURST
9        Assistant Federal Public Defender

10

11        */s/ Melanie Gavisk*
12        MELANIE GAVISK
13        Assistant Federal Public Defender

14

15

CERTIFICATE OF ELECTRONIC SERVICE

In accordance with Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure, the undersigned hereby certifies that on the 22nd day of April, 2015, a true and correct copy of the foregoing REPLY IN SUPPORT OF SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS was served by the United States District Court, CM/ECF electronic filing system to:

Daniel M. Roche
Deputy Attorney General
DRoche@ag.nv.gov

*/s/ Felicia Darensbourg*
An employee of the Federal Public Defender

61