**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

CHARLES McNELTON,

    Petitioner

v.

WILLIAM GITTERE,[1] et al.,

    Respondents

Case No.: 2:00-cv-00284-RCJ-DJA

**ORDER**

Before the court for a decision on the merits is a petition for a writ of habeas corpus filed by Charles McNelton, a Nevada prisoner sentenced to death. ECF No. 133. For reasons that follow, the petition will be denied.

I.  BACKGROUND

The facts underlying McNelton's conviction and sentence were recounted by the Nevada Supreme Court as follows:

> McNelton lived with Brian Jackson, his cousin, at 1237 Hart Street in Las Vegas, near Gerson Park. Andre Lee and his family lived several houses down the street. Lee, Jackson, and [Monica] Glass, the sixteen-year-old victim, all sold crack cocaine on Hart Street. At some point in 1989, a dispute arose among those three because Lee's brother-in-law Leroy Wilson was helping Jackson sell cocaine

---

[1] As the current warden of Ely State Prison, William Gittere is substituted for Renee Baker as a respondent. *See* Fed. R. Civ. P. 25(d).

at night. Wilson normally sold for Glass. Jackson apparently wanted Wilson to sell for him full-time, but Wilson was loyal to Glass and had refused.

In the afternoon on May 13, 1989, Lee was selling crack cocaine on the street in front of his house. Lee's wife Linda and two other women were also outside the house. Jackson rode up to Lee on a bicycle and told Lee to stop selling. Lee testified that Jackson "didn't want anybody to sell anything if they wasn't selling it for him." Lee ignored Jackson, who cycled home. Approximately five minutes later, Jackson returned with a gun. When a customer drove up, Jackson put the gun, a .25 caliber automatic, to Lee's temple and told him not to go to the customer. Lee did anyway. Jackson appeared upset by this and cycled back toward his house.

Approximately five to ten minutes later, McNelton approached Lee from the direction Jackson had gone. McNelton asked Lee if Lee was messing with his cousin, meaning Jackson. Glass then came out of Lee's house and walked to the end of the sidewalk, where everyone was assembled. McNelton asked her the same question. Glass said, "Chuck, get outta my face with that shit." McNelton responded, "I'm gonna show you what I do to people who mess with my family." McNelton then grabbed the back of Glass's head with his left hand, placed a gun to her forehead with his right, and fired once, killing her.

*McNelton v. State*, 990 P.2d 1263, 1265-66 (Nev. 1999)

McNelton was initially charged with one count each of murder and manslaughter with the use of a deadly weapon. The manslaughter count was based on the fact that Glass was pregnant at the time of the shooting and was later dismissed. McNelton was serving an unrelated prison sentence in California when he was extradited to Nevada in December 1991.

On October 8, 1993, after a five-day trial, a jury in the Eighth Judicial District Court for Nevada found McNelton guilty of one count of first-degree murder with the use of a deadly weapon. After a three-day penalty hearing, the jury found two aggravating circumstances: (1) the murder was committed by a person who was previously convicted of felonies involving the use or threat of violence to the person of another and (2) the murder was committed by a person under a sentence of imprisonment. The jury imposed a sentence of death.

The Nevada Supreme Court affirmed his conviction and sentence in a published opinion. *McNelton v. State*, 900 P.2d 934 (Nev. 1995). McNelton's petition for certiorari with respect to that decision was denied by the U.S. Supreme Court on May 20, 1996. *McNelton v. Nevada*, 517 U.S. 1212 (1996). Thereafter, McNelton filed a post-conviction petition for writ of habeas corpus in the state district court. After the district court appointed counsel, McNelton filed several supplemental pleadings. The state district court held an evidentiary hearing and subsequently entered a decision denying all of McNelton's claims. McNelton appealed.

The Nevada Supreme Court affirmed the denial of McNelton's petition in a published opinion. *McNelton v. State*, 990 P.2d 1263 (Nev. 1999). In March 2000, McNelton initiated this federal habeas proceeding. After prolonged discovery proceedings, McNelton filed an amended petition in November 2006.

The respondents filed a motion to dismiss the amended petition on the ground that it contains several unexhausted claims. In lieu of filing an opposition to that motion, McNelton filed a motion for stay and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005). That motion was granted.

In October 2007, McNelton filed a second post-conviction petition for writ of habeas corpus in state court. After being amended once, that petition was denied. McNelton appealed. The Nevada Supreme Court affirmed the denial of his petition.

In April 2013, McNelton moved to reopen these proceedings. After that motion was granted, McNelton filed a second-amended petition for writ of habeas corpus. In deciding respondents' motion to dismiss that petition, this court dismissed several claims as time-barred or procedurally defaulted. Having denied McNelton's motion for an evidentiary hearing, the court now decides McNelton's remaining claims on the merits.

## II.  STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), which imposes the following standard of review:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d),

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521

U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014).; *see also Miller-El*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

Because de novo review is more favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254 by engaging in de novo review rather than applying the deferential AEDPA standard. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

\ \ \

\ \ \

\ \ \

### III.  DISCUSSION

     *1.  Claim 5(C)*

In Claim Five (C), McNelton alleges trial counsel were ineffective for failing to challenge the admission of evidence of prior bad acts during the penalty phase. McNelton cites to evidence presented by the State that McNelton robbed someone in January 1980 and that he was arrested in December 1977 in possession of a women's watch and a shotgun. According to McNelton, investigation by counsel would have revealed that McNelton was not responsible for the robbery and that no charges were filed in relation to the 1977 arrest. In addition, counsel should have argued that presentation of these non-statutory circumstances was unconstitutional.

Under the heading for Claim 5(C), McNelton also alleges that trial counsel was ineffective in failing to request a hearing on the admissibility of prior bad acts in the guilt phase of his trial. ECF No. 133, p. 70-71. Apparently focusing on this aspect of the claim, which was fairly presented to the Nevada Supreme Court and adjudicated on the merits (*McNelton*, 990 P.2d at 1268-1270), respondents did not assert procedural default as an affirmative defense to Claim 5(C) in their motion to dismiss on procedural grounds (ECF No. 146). They did, however, raise the defense in their answer. ECF No. 178, p. 10-11.

The penalty phase ineffective assistance of counsel (IAC) claim based on counsel's failure to challenge the admissibility of prior bad acts was presented to the Nevada courts in the same fashion as the other penalty phase IAC claims that this court determined to be procedurally defaulted. ECF No. 175, p. 14-25. The same procedural default analysis applies. Thus, the court agrees with respondents that the claim is procedurally defaulted. And, given that respondents asserted procedural default in their answer, McNelton's claim that they waived the defense is without merit. *See Morrison v. Mahoney*, 399 F.3d 1042, 1047 (9th Cir. 2005) (holding that state

did not waive procedural default defense when it failed to raise the defense in motion to dismiss, but subsequently asserted the defense in its answer).[2] In addition, this court has already rejected McNelton's arguments in support of overcoming the default. ECF No. 175, p. 24-25,

Claim 5(C) is dismissed.

### 2. *Claim 6(D)*

In Claim 6(D),  McNelton argues that trial counsel was ineffective for allowing a defense witness to testify about McNelton's custody status and for calling himself to rebut the witness's testimony. The claim refers to defense counsel, Drew Christensen, and defense witness, Michael Turner, who Christensen had called to support McNelton's alibi defense. After Turner testified on cross-examination that he visited McNelton in jail and that Christensen told him not to mention that fact in his testimony, Christensen took the stand to attempt to clarify that he had told Turner to tell the truth but to avoid mentioning McNelton's custody status. According to McNelton, Christensen did not consult with him about the decision and chose to defend himself rather than maintain his allegiance to his client.

To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show 1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and 2) that it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984).

In McNelton's state post-conviction proceedings, the Nevada Supreme Court recognized that *Strickland* provided the federal law standard for adjudicating ineffective assistance of

---

[2] McNelton disavows raising a guilt phase IAC claim under Claim 5(C). ECF No. 184, p. 16 n.4.

counsel claims. *McNelton*, 990 P.2d at 1268. In addressing the IAC based on Christensen's handling of Turner, the state supreme court held as follows:

> McNelton argues that his trial counsel were ineffective for failing to prevent the prosecutor from eliciting testimony from Michael Turner, McNelton's cousin, that McNelton was in custody prior to trial. Turner testified as an alibi witness. McNelton also argues that his trial counsel were ineffective because one of them testified with respect to this issue.

> During cross-examination, Turner mentioned that McNelton was in custody. The prosecutor asked Turner, "Did you ever talk to [Wanda McNelton] about [McNelton] being arrested for murder?" Turner replied, "I found out through my family that my cousin was like incarcerated." Later in cross-examination, the prosecutor asked Turner about finding out that McNelton was incarcerated. On recross-examination, the prosecutor asked Turner about visiting McNelton in 1992 in Las Vegas, "You mean to tell me that [McNelton] didn't ask you to testify in this matter way back in 1992?" Turner replied, "No, we didn't even talk about why he was in jail." The prosecutor then asked whether Turner knew why McNelton was in jail and whether anyone told Turner not to tell the jury that he had visited McNelton in jail.

> Mentioning that McNelton was incarcerated and eliciting that information from Turner was improper. We have previously stated that "[i]nforming the jury that a defendant is in jail raises an inference of guilt, and could have the same prejudicial effect as bringing a shackled defendant into the courtroom." *Haywood v. State*, 107 Nev. 285, 288, 809 P.2d 1272, 1273 (1991). In *Haywood*, the prosecutor referred to the fact that the defendant had been in custody between the time of his arrest and trial; the prosecutor cross-examined the defendant about jail visits he received from friends and relatives. *Id*. at 287, 809 P.2d at 1273. We concluded in *Haywood*, however, that this error was harmless because five witnesses identified the defendant and other evidence connected him to the crime. *Id*. at 288, 809 P.2d at 1273. Likewise, we conclude that the error in the instant case was harmless because of the substantial evidence of McNelton's guilt. Counsel therefore were not ineffective on this ground.

> As noted above, McNelton also argues that one of his defense counsel, Drew Christensen, made matters worse by taking the stand shortly after Turner testified. Turner had testified on direct examination that the last time he saw McNelton was at the party in 1989. On cross-examination, however, Turner said that the last time he saw McNelton was when he visited him in the Las Vegas jail in 1992 and that Christensen told him not to say anything about that visit. When Christensen testified, he denied telling Turner not to mention visiting McNelton and said that he told Turner not to mention that McNelton was in jail because he did not want the jury to know that McNelton was incarcerated.

Christensen could have bolstered Turner's credibility when he explained to the jury that Turner was not trying to hide anything, but simply thought that he had been instructed not to mention the jail visit. On the other hand, Christensen could have hurt McNelton if it appeared to the jury that Christensen was just trying to vindicate himself. We do not decide whether counsel's decision to have Christensen testify was right or wrong, but conclude that the decision was a tactical one and unchallengeable absent extraordinary circumstances not present here. *See Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052; *Howard v. State*, 106 Nev. 713, 722, 800 P.2d 175, 180 (1990). Accordingly, we conclude that counsel were not ineffective on this ground.

*Id.* at 1270–71.

With respect to the allegation that counsel was ineffective in "allowing" Turner to testify about McNelton's custody status, this court agrees with the Nevada Supreme Court that McNelton cannot demonstrate that the testimony resulted in *Strickland*-level prejudice given the evidence of McNelton's guilt. Andre Lee, Linda Lee, and Leroy Wilson all testified at trial to seeing McNelton place a hand on the back of Glass's head and shoot her in the forehead. ECF No. 149-32, p. 16-17; ECF No. 149-33, p. 18-19; ECF No. 149-34, p. 19-20. McNelton does not refute the Nevada Supreme Court's conclusion in his reply to the State's answer. ECF No. 184, p. 18-23.

As for Christensen's decision to take the stand, this court also agrees that the decision is defensible as a tactical decision that "falls within the wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689. McNelton contends that the Nevada Supreme Court erred by "call[ing] the decision 'tactical,' without any evidentiary support for that conclusion,'" noting that Christensen did not classify the decision as such in his post-conviction testimony. ECF No. 184, p. 22. The Supreme Court in *Richter*, however, rejected the notion that a reviewing court must have evidence of counsel's "actual thinking" before making such a determination:

Although courts may not indulge "*post hoc* rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions,

neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland,* however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Richter*, 562 U.S. at 109–10 (citations omitted).

Here the record establishes that Christensen confronted a difficult decision after Turner testified that Christensen had instructed him to not tell the jury that he had visited McNelton in jail. ECF No. 149-40, p. 31-32. By not taking the stand to attempt to clarify his instructions to Turner, he ran the risk of leaving the jury with the impression that he had instructed Turner to conceal information, which would certainly lessen Christensen's credibility with the jury. On the other hand, his taking the stand could suggest to the jury that he was merely attempting to cover himself, remind them that McNelton was in custody, and potentially lessen the impact Turner's alibi testimony. Given these circumstances, Christensen's decision to testify was, at most, a "reasonable miscalculation" rather than an instance of ineffective assistance of counsel. *See Richter*, 562 U.S. at 110 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight….").

Based on the foregoing, Claim 6(D) is denied.

### 3. *Claims 6(F), 11(E), 14(I), and 15.*

Claims 6(F), 11(E), 14(I), and 15 are all premised on an allegation that McNelton's conviction and sentence are unconstitutional because the State violated his rights under the Interstate Agreement on Detainers (IAD). In addition to raising a substantive claim based on an

alleged violation of the IAD (Claim 15), McNelton alleges a violation of his right to effective assistance of counsel premised on his counsel's deficient performance in litigating his IAD claim in the trial court (Claim 6(F)) and on appeal (Claim 14(I)). He also claims he is entitled to habeas relief because the trial court failed to dismiss his case under the IAD (Claim 11(E)).

On June 1, 1992, McNelton's counsel filed a motion to dismiss the charges against McNelton on the ground that the State failed to comply with Article III of the IAD, codified at Nev. Rev. Stat. § 178.620.[3] ECF No. 147-29. Specifically, McNelton claimed the State failed to conduct the trial on his murder charges within 180 days of June 19, 1991, the date he caused his form invoking his Article III trial rights to be delivered to the State of Nevada. *Id*., p. 8.

At the hearing on the motion, the prosecutor, Chris Owens, indicated to the court that McNelton had sent the form invoking his IAD rights on June 19, 1991. ECF No. 147-32, p. 8. The next day, the trial court announced it was granting the motion. ECF No. 148. The State moved for a rehearing, arguing that McNelton had not properly completed and delivered the necessary forms to invoke his rights under Article III, that he had tolled the 180-day period due to his own conduct, and that the IAD did not apply because McNelton had been paroled in California prior to his return to Nevada. ECF No. 148-2. Attached to the motion were the affidavits of Nadine Mulkey, the extradition coordinator for the Clark County District Attorney's office, and Chris Owens. *Id*., p. 21-24. The former recounted her office's efforts to extradite McNelton and stated that "[a]t no time during the course of this extradition process did affiant

---

[3] Nev. Rev. Stat. § 178.620 provides, in pertinent part, that when a detainer has been lodged against a prisoner in another state:

> …the prisoner shall be brought to trial within one hundred eighty days after the prisoner shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of imprisonment and the prisoner's request for a final disposition to be made of the indictment, information or complaint…

receive from either the defendant or representatives of the California Prison System a Form II request of the defendant pursuant to Article III of the [IAD]." *Id.*, p. 21-23. In the latter, Owens stated that he was mistaken in his earlier representation to the court that McNelton had sent the State a demand for a speedy trial and that the State was not aware of any such forms until McNelton had filed his motion to dismiss. *Id.*, p. 24.

The court held a hearing on September 15, 1992. At that hearing, the court noted that Mulkey's affidavit contained hearsay and could not be considered "as evidence of facts." *Id.*, p. 947. The court indicated, however, that it was going to delve into whether McNelton's supposed release on parole had taken him out from under Article III of the IAD. *Id.*, p. 953. The following day, the trial court entered an order vacating its dismissal and indicating that it would reconsider whether McNelton "was still under a term of imprisonment so as to be protected by Article III of the I.A.D." ECF No. 148-7.

In the meantime, the State also appealed the trial court's dismissal, even though it had been vacated. ECF No. 148-8. The Nevada Supreme Court dismissed the appeal, noting that there was no order to appeal from because the trial court had already vacated its order of dismissal. ECF No. 149. The Nevada Supreme Court noted, however, that the trial court could, in rehearing the matter, consider a recently-decided case, *Fex v. Michigan*, 507 U.S. 43 (1993). *Id.* At a hearing shortly thereafter, the trial court ruled that *Fex* was dispositive in the State's favor, a point which McNelton's counsel conceded. ECF No. 149-2. Thus, the trial court granted the State's motion for reconsideration, denied McNelton's motion to dismiss, and set the matter for trial. *Id.*

"[T]he IAD is a federal law subject to federal construction." *New York v. Hill*, 528 U.S. 110, 111 (2000). Federal habeas review of IAD violations is limited to errors constituting "a

fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *Reed v. Farley*, 512 U.S. 339, 348 (1994) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). A mere "technical" violation is insufficient; there must be some aggravating circumstances. *Id*. at 350.

The holding in *Fex* is that the 180-day period contemplated in Article III begins not when the prisoner sends his request for final disposition of the charges against him, but instead when the request "has actually been delivered to the court and prosecuting officer of the jurisdiction that lodged the detainer against him." *Fex*, 507 U.S. at 52. Implicit in the trial court's conclusion that *Fex* was dispositive in the State's favor was a finding that McNelton's request for disposition, even if sent, was not "actually delivered" to the state district court and the Clark County District Attorney's office, at least not more than 180 days prior to him being brought to trial in Nevada. McNelton has provided neither the state courts nor this court evidence that this finding is erroneous. Because McNelton has not established that his rights under the IAD were violated, there is "no fundamental defect" for this court to consider. Consequently, Claims 11(E) and 15 fail on the merits.

McNelton presented his claims that trial counsel and appellate counsel were ineffective in litigating the IAD issue to the Nevada Supreme Court. Again, the court applied the correct federal law standard, *Strickland*, to the claims. *McNelton*, 990 P.2d at 1268. The court analyzed the claims as follows:

> McNelton contends that appellate counsel was ineffective for failing to argue that the trial court erred in denying his motion to dismiss. He argues that counsel should have argued that the state relied on hearsay documents and that the case the district court relied on in denying his motion is not controlling in Nevada and is wrong as a matter of federal law. McNelton also argues that trial counsel were ineffective for failing to fully investigate and demand an evidentiary hearing on the extradition issue.

In his motion to dismiss, McNelton argued that Nevada's failure to follow Article III(a) of the Interstate Agreement on Detainers (IAD) (codified at NRS 178.620) warranted dismissal. Article III(a) essentially provides that a state must bring a defendant under a term of imprisonment in another party state to trial within 180 days if:

> "(1) the defendant has entered upon a term of imprisonment in a penal or correctional institution of a party state, (2) during the continuance of that term of imprisonment the charges in question are pending against the defendant in another party state, (3) a detainer based on such charges has been lodged against the defendant, and (4) the defendant has caused written notice and request for final disposition of the charges to be delivered to the appropriate prosecuting authorities and court."

*State v. Wade*, 105 Nev. 206, 208, 772 P.2d 1291, 1293 (1989) (quoting *United States v. Hutchins*, 489 F.Supp. 710, 713 (N.D. Ind. 1980)); *see* NRS 178.620, Article III(a). Failure to bring the defendant to trial within 180 days results in dismissal of the charges with prejudice. *Wade*, 105 Nev. at 208, 772 P.2d at 1293 (citing NRS 178.620, Article V(c)).

After hearing argument on the motion, the district court concluded that McNelton made an Article III request to California authorities no later than June 19, 1991, which triggered California's obligation to notify Nevada to retrieve McNelton and try him. The court concluded that McNelton was not even brought to Nevada until after the 180 days had run. The court entered its written order granting McNelton's motion on August 18, 1992.

The state moved for rehearing on the ground that at the time it granted McNelton's motion, the court was operating under the mistaken belief that McNelton had signed the request for disposition of the charges on June 19, 1991, when that form was actually not dated. The state also argued that because McNelton had been released on parole prior to being sent to Nevada, the IAD did not apply. As support, the state attached an affidavit of Nadine Mulkey, the extradition coordinator for the Clark County District Attorney's office. The affidavit stated that Mulkey did not receive from either McNelton or California prison authorities a request for disposition of the charges against him. It further stated that Mulkey examined the request for disposition and other documents attached to McNelton's motion to dismiss and was not aware that those documents existed.

At a September 15, 1992, hearing on the state's motion, the district court was concerned because Mulkey's affidavit contained different facts than the court was aware of previously. The court said that Mulkey's affidavit was hearsay and the court could not consider it as evidence of facts. The court took the matter

under submission. The next day, however, the court vacated its order dismissing the case and granted the state's motion solely to reconsider whether McNelton had been under a term of imprisonment pursuant to Article III(a).

On September 17, 1992, believing that the district court's order granting its motion for rehearing was a "legal nullity," the state appealed from the district court's order dismissing the case. This court dismissed the appeal, concluding that it lacked jurisdiction because the district court vacated the order appealed from. In a footnote, this court stated that the district court was "free to consider the applicability of any recent opinions of the United States Supreme Court," specifically citing *Fex v. Michigan*, 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993). *State v. McNelton*, Docket No. 23898, 109 Nev. 1418, 875 P.2d 1080 (Order Dismissing Appeal, April 27, 1993).

At a hearing on May 6, 1993, the district court stated that although its original order on this issue was consistent with the dissent in *Fex*, it believed that the majority in *Fex* obligated the court to deny McNelton's motion to dismiss. *Fex* holds that Article III(a)'s 180-day time period does not begin to run until a prisoner's request for final disposition of the charges against him is actually delivered to the court and the prosecuting officer of the jurisdiction that lodged the detainer against him. *Fex*, 507 U.S. at 52, 113 S.Ct. 1085. Defense counsel agreed that *Fex* was dispositive. The court granted the state's motion for reconsideration, denied McNelton's motion to dismiss, and set the matter for trial.

We conclude that appellate counsel was not ineffective for failing to raise this issue on appeal because the district court did not abuse its discretion in denying McNelton's motion to dismiss. *See Steese v. State*, 114 Nev. 479, 490, 960 P.2d 321, 328 (1998). First, the court was not bound by its statement at the September 15, 1992 hearing that Mulkey's affidavit was hearsay. The court could consider Mulkey's statement in her affidavit that the prosecutor's office did not receive from McNelton a request for final disposition of the charges against him. Second, *Fex* is directly on point, and the district court did not err in applying it. *See Fex*, 507 U.S. at 52, 113 S.Ct. 1085. Thus, had appellate counsel argued on appeal that the district court erred in considering the affidavit because it was hearsay and *Fex* did not apply, there is not a reasonable probability that this court would have reversed the judgment. We further conclude that trial counsel were not ineffective for failing to demand an evidentiary hearing on this issue. McNelton does not specify what evidence trial counsel would have presented such that there is a reasonable probability that the district court would have granted the motion.

*McNelton*, 990 P.2d at 1273-75 (footnote omitted).

McNelton argues that the Nevada Supreme Court's prejudice analysis in relation to his ineffective assistance of trial counsel claim was faulty because the court failed to consider "dated forms from California invoking his rights under the IAD," which he claims are "compelling evidence that [he] had sent the required documents to the State."

This court does not necessarily agree that the dated forms are strong evidence that the forms were actually sent on the date indicated. The bigger problem with this argument, however, is that, under *Fex*, evidence that the documents were sent is practically irrelevant in the absence of any convincing evidence that the documents were actually received by the Clark County District Attorney's office. McNelton cites to no evidence that refutes Mulkey and Owen's sworn affidavits that the office did not receive a request for disposition from McNelton during the relevant time period. Thus, the Nevada Supreme Court's prejudice analysis was not flawed as McNelton contends.

Similarly, the Nevada Supreme Court did not err in concluding that McNelton was not prejudiced by appellate counsel's failure to raise the IAD issue on appeal. McNelton places significant weight on the trial court's statement at the September 15, 1992, hearing that Mulkey's affidavit contained hearsay. The judge was clearly referring, however, to statements attributed to "unnamed [prison] employees in California," not to Mulkey's denial that she had received a Form II request from McNelton. ECF No. 91-2, p. 947. That is because the issue the court was attempting to resolve at the time, pre-*Fex*, was whether McNelton had sent the form from California State Prison. Later, when the relevant inquiry had shifted to whether the form had been actually delivered, the trial court had no evidence before it that the Clark County District Attorney's office had received the form (other than Owen's subsequently-retracted comment at the initial hearing). Thus, the court did not err in denying McNelton's motion to dismiss.

1   Accordingly, the Nevada Supreme Court reasonably concluded that there was not a reasonable

2   probability McNelton could have successfully pursued the issue on appeal.

3       Based on the foregoing, Claims 6(F), 11(E), 14(I), and 15 are denied.

4          *4.  Claim 8(C) and 11(B)*

5       Claims 8(C) and 11(B) are premised on an allegation that McNelton's conviction and

6   sentence are unconstitutional because the prosecutor commented on McNelton's statement in

7   allocution. In addition to raising a prosecutorial misconduct claim based on the comment (Claim

8   8(C)), McNelton alleges the trial court erred in permitting the comment after having advised

9   McNelton that his unsworn statement could never be used against him (Claim 11(B)).

10      At the close of the State's penalty phase case, the trial court advised McNelton that he

11  had "the right to make a statement to the jury, an unsworn statement, a right of allocution,"

12  which must be limited to a statement "of remorse or apology or chagrin or plans for the future"

13  and must not "deny guilt or try to revisit the guilt phase of the trial." ECF No. 150-5, p. 29-30.

14  The trial court further advised McNelton that if he wished to rebut the testimony of a prior

15  witness, he would have to testify under oath and be subject to cross examination. *Id*., p. 31. By

16  way of explanation, the trial court told McNelton:

17         There's a difference between making an unsworn statement which can
    never again be used against you and taking the stand and testifying to rebut what

18      the officer testified to.

19  *Id.* After consulting with counsel, McNelton made a brief statement to the jury in which he tried

20  to impress upon them that, while he had done bad things, he was not "the monster" that the

21  district attorney and some witnesses had suggested he was. *Id*., p. 34.

22      As recounted by the Nevada Supreme Court in the excerpt below, the prosecutor in his

23  closing statement remarked that the unsworn statement was McNelton's opportunity to express

remorse for killing Monica Glass and to relate his plans for the future, but that McNelton neglected to address either subject or apologize for any of his past criminal behavior. ECF No. 150-6, p. 36-37.

In deciding McNelton's direct appeal, the Nevada Supreme Court addressed his prosecutorial misconduct claim as follows:

> At the penalty phase of the trial, McNelton exercised his right of allocution, which is his right to make an unsworn statement to the jury in mitigation of sentencing, and includes "'statements of remorse, apology, chagrin or plans and hopes for the future.'" *Homick v. State,* 108 Nev. 127, 133, 825 P.2d 600, 604 (1992) (quoting *DeAngelo v. Schiedler,* 306 Or. 91, 757 P.2d 1355, 1358 (1988)). After McNelton made his statement, the prosecutor, in his rebuttal closing argument, stated:

>> And then we heard from the Defendant in his unsworn statement not subject to cross-examination, and we learned quite a bit about this person that we will be punishing here, Mr. McNelton. *This was his opportunity to express remorse, to say how sorry he was about Monica Glass, how he felt about taking a human life and his remorse.*

>> This was the opportunity for Mr. McNelton to tell you that, "I'm going to make this a positive. If you give me life without parole, I'm going to work hard in prison. I'm going to abide by the duties and the regulations that are imposed upon me. I'm going to make myself a better person."

>> [OBJECTION AND OBJECTION OVERRULED]

>> And he stood before you. *He was here facing the people that were going to determine his future, and not once did you ever hear his remorse about killing Monica Glass;* not once did you ever hear about apologies for his criminal behavior; not once did you hear him say that he was sorry [for his past crimes].

> (Emphasis added.)

> McNelton claims that these statements constituted an improper comment on the exercise of his Fifth Amendment right against self-incrimination, violating the rule enunciated in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). We disagree.

In *Harkness v. State,* 107 Nev. 800, 803, 820 P.2d 759, 761 (1991), this court stated:

> The United States Constitution states that a defendant shall not "be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V; *see also* Nev. Const. Art. 1, Sec. 8. A direct reference to a defendant's decision not to testify is always a violation of the fifth amendment. *See Griffin v. California,* 380 U.S. 609, [85 S.Ct. 1229, 14 L.Ed.2d 106] (1965); *Barron v. State,* 105 Nev. 767, 783 P.2d 444 (1989). When a reference is indirect, the test for determining whether prosecutorial comment constitutes a constitutionally impermissible reference to a defendant's failure to testify is whether "the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be comment on the defendant's failure to testify." *United States v. Lyon,* 397 F.2d 505, 509 (7th Cir.), *cert. denied sub nom., Lysczyk v. United States,* 393 U.S. 846 [89 S.Ct. 131, 21 L.Ed.2d 117] (1968). *See also Barron,* 105 Nev. at 779, 783 P.2d at 451–52. The standard for determining whether such remarks are prejudicial is whether the error is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 21–24 [87 S.Ct. 824, 826–28, 17 L.Ed.2d 705] (1967).

The prosecutor's comments in this case refer indirectly to McNelton's failure to testify. Pursuant to *Harkness,* the first question is whether the jury would naturally and necessarily view the prosecutor's comments as comments on McNelton's failure to testify. We conclude that the jury would not naturally and necessarily view them that way. The prosecutor accused the defendant of failing to express remorse. The natural inference the jury would draw from this statement would be that the defendant was an unfeeling man, not that he failed to testify.[1]

McNelton exercised his right of allocution, and the prosecutor was entitled to comment in rebuttal on McNelton's statement, including commentary on what McNelton did not say which he could properly have said within the bounds of an allocution statement. There is a difference between a comment on the defendant's failure to testify and a comment on omissions in the defendant's statement which reflect on his character. *See United States v. Lopez–Alvarez,* 970 F.2d 583, 595–96 (9th Cir.), *cert. denied,* 506 U.S. 989, 113 S.Ct. 504, 121 L.Ed.2d 440 (1992) (prosecutor may comment on defense's failure to present exculpatory evidence, as long as that comment is not phrased to call attention to defendant's failure to testify). Viewed in context, the prosecutor's comments in the instant case did not call attention to McNelton's failure to testify, but instead addressed McNelton's failure to show any compassion for the victim while seeking compassion for himself. Admission of these statements did not constitute error. Even if the inference were drawn from the prosecutor's statements that he was commenting

1  on McNelton's failure to testify, we conclude that the error was harmless beyond a
2  reasonable doubt.

_____

3      [1] In *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir.), *cert. denied*, 502
4  U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991), the Court of Appeals
   held that the prosecutor's comment about the defendant's failure to express
5  remorse was a clear reference to the defendant's refusal to incriminate
   himself. In the context of the instant case, we disagree with that
6  conclusion.

7  *McNelton*, 900 P.2d at 936–37.

8      The Ninth Circuit has explained that a prosecutorial comment violates the *Griffin* rule "if

9  it is manifestly intended to call attention to the defendant's failure to testify, or is of such a

10 character that the jury would naturally and necessarily take it to be a comment on the failure to

11 testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987). Reversal is required only if: "(1)

12 [T]he commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a

13 basis for the conviction; and (3)[ ] there is evidence that could have supported acquittal." *Jeffries*

14 *v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993) (quoting *Lincoln*, 807 F.2d at 809). Also, an

15 improper comment warrants habeas relief only if it results in actual prejudice. *Jeffries*, 5 F.3d at

16 1190 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

17     Here, the prosecutor's comments were similar to the challenged comments in *Jeffries* in

18 that the prosecutor in both instances noted that the defendant's allocution was unsworn and not

19 subject to cross-examination. *See id.* at 1191. In that case, the Ninth Circuit concluded that the

20 comment "[did] not create error, much less constitutional error." *Id* at 1192. In *Blodgett*, the

21 defendant claimed, in his allocution, that he was not guilty and "refused to beg for mercy for

22 crimes he did not commit." *Id*. at 1191. In response, the prosecutor argued that the defendant's

23 statement was "insulting to the intelligence" and "full of arrogance. *Id*.

McNelton did not deny guilt in his allocution. However, the prosecutor, by faulting McNelton for not expressing remorse, was, in an indirect way, faulting him for not admitting guilt, which would have been self-incriminating. Even so, the comments were, at most, a borderline violation of *Griffin*. Because fairminded jurists could disagree on the question, the Nevada Supreme Court's rejection of McNelton's *Griffin* claim precludes habeas relief in this court. Moreover, after comparing the significant amount of aggravating evidence against McNelton to the paucity of mitigating evidence, this court concludes that any improper reference to McNelton's failure to express remorse did not influence the jury's sentencing decision. *See* ECF No. 150-1 through 5; *cf. Lesko*, 925 F.2d at 1546. Thus, Claim 8(C) does not warrant habeas relief.

As for the alleged trial court error, the trial court's attempt to explain to McNelton the distinction between an allocution and testifying under oath was poorly-worded and moderately misleading. There is no evidence, however, that McNelton relied on the statement in deciding to exercise his state law right of allocution. In addition, McNelton cites to no authority for his position that an error of this type amounts to a constitutional violation for which habeas relief may be granted. And, for the reason noted above, any error arising from the trial court permitting the prosecutor's comments was harmless.  Claim 11(B) is also denied.

    5. *Claim 13.*

In Claim Thirteen, McNelton alleges that his conviction and sentence are unconstitutional because the under-sentence-of-imprisonment aggravating circumstance is invalid. McNelton points to the fact that he was on parole on an attempted robbery conviction at the time of the killing, which means that the circumstance's presumed purpose – i.e., to deter in-prison offenses – did not serve any rational purpose in his case. According to McNelton, when it is applied in

such a manner, the aggravating circumstance is unconstitutionally vague and violates the federal

constitutional rule of lenity. McNelton also argues that the State's application of the aggravator

conflicts with its successful argument that McNelton was not under a sentence of imprisonment

for IAD purposes because the had been paroled.

In deciding McNelton's direct appeal, the Nevada Supreme Court held as follows:

> McNelton argues that he was not "under sentence of imprisonment" within the meaning of NRS 200.033(1) at the time of the murder. This contention is without merit. This court has upheld the "sentence of imprisonment" aggravator when a defendant commits the murder while still serving his sentence for another crime even though he has been released from physical incarceration. *See Geary v. State,* 110 Nev. 261, 871 P.2d 927 (1994).

*McNelton*, 900 P.2d at 938 (footnote omitted).

McNelton cites to no controlling or persuasive authority holding that the under-a-

sentence-of-imprisonment aggravating circumstance is constitutionally suspect. Even so, he

argues that the factor is unconstitutional when applied to offenders on parole because doing so

"does not sufficiently narrow the class of murders eligible for the death penalty." ECF No. 184,

p. 36 (citing *Zant v. Stephens*, 462 U.S. 21 862, 877 (1983)). This argument fails. To pass

constitutional muster, an aggravating circumstance must meet two requirements.  First, the

circumstance may not apply to every defendant convicted of a murder; it must apply only to a

subclass of defendants convicted of murder. *See Arave v. Creech*, 507 U.S. 463, 474 (1993). ("If

the sentencer fairly could conclude that an aggravating circumstance applies to every defendant

eligible for the death penalty, the circumstance is constitutionally infirm").  Even when

interpreted to include parolees, the under-sentence-of-imprisonment aggravating circumstance

fulfills this requirement.

Second, the aggravating circumstance may not be unconstitutionally vague. *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). In *Godfrey*, the Supreme Court considered an aggravating circumstance instruction that allowed for the death penalty if the jury found that the murder was "'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.'" 446 U.S. at 422 (quoting Georgia statute). The Court held that the instruction was unconstitutional as applied in that case because it resulted in "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury." *Id*. at 429. The Court further held that the Georgia Supreme Court failed to cure the defect because it did not apply a constitutional construction of the statutory language in affirming petitioner's death sentences on appeal. *Id*. at 432-33.

As explained in *Tuilaepa v. California*, the Supreme Court has found very few death sentence eligibility or selection factors to be impermissibly vague and all of those have been similar to each other. 512 U.S. 967, 973-74 (1994) (citing to *Godfrey* and *Maynard v. Cartwright*, 486 U.S. 356, 361-364 (1988), as examples, the latter of which addressed an aggravating circumstance that asked whether the murder was "especially heinous, atrocious, or cruel").[4] An aggravating factor withstands a constitutional challenge if it has some "common sense core of meaning . . . that criminal juries should be capable of understanding." *Id*. at 973 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976) (White, J., concurring in judgment)).

---

[4] Though *Tuilaeapa* was decided over 25 years ago, this state of affairs still applies today. In the rare instances since *Tuilaeapa* where the Court has found a capital sentencing factor invalid on vagueness grounds, the factor has consisted of pejorative adjectives that generally apply to all murders. *See, e.g*., *Barber v. Tennessee*, 513 U.S. 1184 (1995) (mem.) (denying certiorari on other grounds but noting "wicked or morally corrupt" as an aggravating circumstance is "plainly impermissible" because such a state of mind is characteristic of every murder).

The "core meaning" of the under-sentence-of-imprisonment aggravating circumstance, with imprisonment defined to include parolees, is readily understandable. In addition, the statutory language defining the circumstance is specific enough to avoid arbitrary and capricious imposition of the death penalty and sufficiently narrows the class to defendants to which it applies. *See Wainwright v. Lockhart*, 80 F.3d 1226, 1231 (8th Cir. 1996) (upholding the validity of an Arkansas statute that the killing was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody).

McNelton's other arguments also fail. The "rule of lenity " is a rule of statutory construction holding that ambiguous criminal statutes should be construed in a defendant's favor. The rule "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. U.S.,* 442 U.S. 100, 112 (1979). "The rule of lenity, however, is not applicable unless there is a 'grievous ambiguity or uncertainty in the language and structure of the Act,' such that even after a court has 'seize[d] every thing from which aid can be derived,' it is still 'left with an ambiguous statute.'" *Chapman v. United States*, 500 U.S. 453, 463 (1991). The "committed by a person under sentence of imprisonment" aggravating circumstance does not rise to this level. It has been uniformly interpreted to encompass offenders that have not fully discharged an existing sentence of imprisonment at the relevant time, regardless of whether the offender was on probation, incarcerated, on parole, or at large. *See Bejarano v. State*, 146 P.3d 265, 276 (Nev. 2006) (probation); *Lockett v. Puckett*, 980 F. Supp. 201, 244 (S.D. Miss. 1997) (probation); *Davis v. State,* 897 So. 2d 960, 969 (Miss. 2004) (parole); *Hitchcock v. State*, 755 So.2d 638, 644-45 (Fla. 2000) (parole); *Patton v. State*, 973 P.2d 270, 297 (Okla. 1998) (parole); *Nevius v. State*, 101 Nev. 238, 243, 699 P.2d 1053, 1056 (1985) (at large).

24

1    Finally, application of the "under sentence of imprisonment" aggravating circumstance

2  did not conflict with the State successfully arguing that the IAD did not apply because McNelton

3  had been paroled. The factual and legal context of the respective issues were plainly different.

4  Simply put, the factors favoring judicial estoppel are not present here. *See New Hampshire v.*

5  *Maine*, 532 U.S. 742, 750–51 (2001).

6    Claim 13 is denied.

7        *6.   Claim 14(A).*

8    In Claim 14(A), McNelton alleges that his conviction and sentence are unconstitutional

9  because his appellate counsel failed to communicate with him, which constituted abandonment.

10 In July 1994, McNelton sent a letter to appellate counsel, Robert Caruso, asking him to withdraw

11 as his counsel and to petition the court for appointment of counsel outside the Clark County

12 Public Defender's office. ECF No. 151-1. In the letter, McNelton complained that Caruso had

13 not consulted with him or responded to any of his several requests or communication attempts.

14 *Id*. He also complained that, contrary to his wishes, Caruso had raised primarily penalty phase

15 issues on appeal and had overlooked guilt phase issues. *Id*. In response to the letter, Caruso filed

16 a motion to withdraw as counsel, which the Nevada Supreme Court denied. *Id*.

17    A criminal defendant does not have a right to have his appointed appellate counsel

18 present every nonfrivolous issue that he requests. *See Jones v. Barnes,* 463 U.S. 745 (1983).

19 When evaluating claims of ineffective assistance of appellate counsel, the performance and

20 prejudice prongs of the *Strickland* standard partially overlap. *See*, *e.g.*, *Bailey v. Newland*, 263

21 F.3d 1022, 1028–29 (9th Cir. 2001); *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir. 1989).

22 Effective appellate advocacy requires weeding out weaker issues with less likelihood of success.

23 The failure to present a weak issue on appeal neither falls below an objective standard of

competence nor causes prejudice to the client for the same reason – that is, because the omitted

issue has little or no likelihood of success on appeal. *Id.*

In McNelton's state post-conviction proceeding, the Nevada Supreme Court addressed

this claim as follows:

> McNelton argued in the district court, in support of another argument, that he never once spoke with his appellate attorney. The district court did not specifically address this issue because it was not raised as a separate issue in the petition. McNelton raises it here, however, arguing that his appellate counsel was ineffective because counsel failed to consult with McNelton as he crafted arguments on direct appeal. McNelton argues that counsel's performance was deficient *per se.*
>
> The record does not belie McNelton's contention that his appellate counsel did not meet or speak with him. In July and again in August 1994, appellate counsel filed in this court a motion to withdraw based on a letter from McNelton stating that appellate counsel did not answer McNelton's letters, visit him, or take his telephone calls. This court denied the motion, concluding that McNelton's letter did not constitute good cause for appellate counsel to seek appointment of a substitute. Appellate counsel did not thereafter seek to withdraw. We conclude that appellate counsel should have met or spoken with McNelton to discuss his direct appeal. This court has held that failure to communicate with a client warrants disciplinary action. *See State Bar of Nevada v. Schreiber,* 98 Nev. 464, 464, 653 P.2d 151, 151 (1982) (published letter of reprimand stating that "communication with a client is, in many respects, at the center of all services"). Although the circumstances in *Schreiber* are different from those presented here, the ideas expressed there regarding communication are always applicable.
>
> However, even assuming that counsel's performance was deficient because he failed to meet with McNelton, we conclude that McNelton was not prejudiced thereby. There is not a reasonable probability that the result of the direct appeal would have been different had McNelton consulted with his counsel with respect to how to proceed. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. McNelton has not specified here any issues that he would have instructed appellate counsel to raise that counsel neglected to raise. *Cf. Stewart v. Warden,* 92 Nev. 588, 555 P.2d 218 (1976) (holding that where attorney failed to raise requested claims on appeal for no apparent reason, good cause exists to raise those claims on post-conviction). Accordingly, we conclude that counsel was not ineffective on this ground.

*McNelton*, 990 P.2d at 1273

26

Notwithstanding his apparent failure to communicate with McNelton, Caruso filed a lengthy opening brief on McNelton's behalf, raising several claims of error. ECF No. 150-30/31. Caruso also timely filed a reply brief in response to the State's answering brief. ECF No. 151. Then, a couple months later, Caruso filed a successful motion to file a supplemental opening brief to add an argument based on *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127 (1994), which had been decided after Caruso's opening brief. ECF No. 151-3.

Relying on *United States v. Cronic*, 466 U.S. 648, 662 (1984), McNelton argues that, because appellate counsel had abandoned him, the Nevada Supreme Court erred by requiring him to demonstrate prejudice. This argument misrepresents the holding in *Cronic*. In *Cronic*, the Court held that presuming prejudice with respect to an ineffective assistance claim is warranted when "the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel," that is, "that counsel failed to function in any meaningful sense as the Government's adversary." *Cronic*, 466 U.S. at 666. Given Caruso's significant efforts on his behalf, McNelton did not "suffer[] an '[a]ctual or constructive denial of the assistance of counsel altogether.'" *See Smith v. Robbins*, 528 U.S. 259, 286 (2000) (quoting *Strickland*, 488 U.S. at 696). Thus, the Nevada Supreme Court correctly determined that he was required to demonstrate prejudice under *Strickland*. *Id*.

McNelton also argues that the Nevada Supreme Court made an unreasonable finding of fact when it determined that he had not specified any issues that he would have instructed appellate counsel to raise that counsel omitted. In this regard, McNelton cites to his appellate brief in his state post-conviction proceeding wherein he devoted a section "to the claims direct appeal counsel failed to raise." ECF No. 184, p. 56 (citing ECF No. 97-8, p. 18-22). In light of its citation to *Stewart v. Warden*, however, the Nevada Supreme Court was referring to McNelton's

27

failure to identify any claims that, but for counsel's lack of communication, he would have personally instructed appellate counsel to raise while his direct appeal was pending. *See Stewart*, 555 P.2d at 219 ("It is uncontroverted that while the appeal was in progress appellant requested his then attorney to raise certain claims of error, and the attorney neither presented those claims of error to the supreme court nor offered any reason or explanation for his failure to do so."). Claims identified by post-conviction counsel in a brief filed four years after the events in question were properly beyond the Nevada Supreme Court's inquiry.

Because the Nevada Supreme Court applied the correct federal law standard and McNelton has not demonstrated an unreasonable application of that standard or an unreasonable determination of fact, this court must defer the state court's decision and deny relief.

Claim 14(A) is denied.

### 7.   *Claim 19.*

In Claim 19, McNelton alleges that his conviction and sentence are unconstitutional due to the cumulative effect of "errors in the admission of evidence and instructions, gross misconduct by state officials and witnesses, and the systematic deprivation of his right to the effective assistance of counsel.

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (internal quotation marks and citation omitted). Habeas relief may be warranted "under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Id*. (internal quotation marks and citation omitted).

Here, McNelton makes no showing as to how multiple errors in concert significantly impacted the outcome of a key issue in his case. In addition, this court sees no instance of this occurring either in the guilt phase, the penalty phase, or the direct appeal of McNelton's conviction and sentence. Claim 19 is without merit and must be denied.

IV.  CONCLUSION

For the reasons set forth above, McNelton is not entitled to habeas relief.

*Certificate of Appealability*

Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The COA standard is not high. McNelton must only "'sho[w] that reasonable jurists could debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to proceed further.'" *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en

29

banc) (citations omitted). Having reviewed its determinations and rulings in adjudicating McNelton's petition, the court finds that the *Slack* standard is met with respect to the court's determination that the holding in *Martinez v. Ryan*, 566 U.S. 1 (2012), could not serve as grounds to excuse McNelton's procedural defaults due to the "insufficient causal connection between the alleged ineffective assistance of McNelton's first post-conviction counsel and the procedural default that serves to bar federal review in this action." ECF No. 175, p. 24-25. The court therefore grants a certificate of appealability as to that issue. The court declines to issue a certificate of appealability for its resolution of any other procedural issues or any of McNelton's habeas claims.

IT IS THEREFORE ORDERED that the second amended petition for writ of habeas corpus (ECF No. 133) is DENIED. The Clerk is directed to enter judgment accordingly.

IT IS FURTHER ORDERED that a certificate of appealability is issued as to the *Martinez* issue identified above. A certificate of appealability is otherwise denied.

Dated: May 14, 2020

_____
UNITED STATES DISTRICT COURT